*Roseberline Turenne v. State of Maryland*, No. 20, September Term, 2023.
Opinion by Biran, J.

**CRIMINAL LAW – SEXUAL ABUSE OF A MINOR – SUFFICIENCY OF THE EVIDENCE –** Petitioner took eight photographs of very young girls who were in her care when she worked as an aide at a daycare facility. All eight photos showed the children's naked genitals and pubic areas. The Supreme Court of Maryland held that the evidence was sufficient to conclude that Petitioner committed child sexual abuse, in violation of Md. Code, Crim. Law ("CR") § 3-602(b)(1) (2021 Repl. Vol.), by sexually exploiting the children whom she photographed. A rational juror could conclude, based on the content of the photographs and the totality of the circumstances surrounding the photographs, that Petitioner took the photographs to obtain sexual gratification.

**CRIMINAL LAW – CHILD PORNOGRAPHY OFFENSES – SUFFICIENCY OF THE EVIDENCE –** The Supreme Court held that whether an image constitutes a "lascivious exhibition" of a child's genitals or pubic area is determined by applying a "content-plus-context" test under which the trier of fact considers: (1) the contents of the image; and (2) the context of the image, *i.e.*, the totality of the circumstances that directly relate to the exhibition of the genitals or pubic area. After reviewing the contents and context of a contested image, the trier of fact must determine whether the image is objectively sexual in nature. Under that standard, a rational juror could have found that the eight photos at issue depicted lascivious exhibitions of the children's genitals or pubic areas. Thus, the Court held that the evidence was sufficient to support Petitioner's convictions for production of child pornography, in violation of CR § 11-207(a)(1), and possession of child pornography, in violation of CR § 11-208(b)(2).

IN THE SUPREME COURT

OF MARYLAND

No. 20

September Term, 2023

---

ROSEBERLINE TURENNE

v.

STATE OF MARYLAND

---

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.

---

Opinion by Biran, J.
Fader, C.J. and Booth, J., concur and dissent.
Watts, J., dissents.

---

Filed: August 16, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

The General Assembly has enacted criminal laws that can result in serious penalties for those who create and possess child pornography. In addition, when a parent, household member, or permanent or temporary caregiver exploits a child by using the child as a subject for child pornography, that person can be prosecuted for child sexual abuse, an offense that also carries serious potential penalties. The General Assembly has created this regime of criminal laws because it strives to protect children from such abuse.

Of course, not all photos of naked children are pornographic. For example, when children are very young, it is not uncommon for parents to take photos or make videos of their children taking baths. Those types of innocent photos are not pornographic. But, unfortunately, some adults create images of children that are not innocent. In many cases, whether an image constitutes child pornography cannot seriously be disputed. For example, if a child is videotaped engaging in a sex act, the resulting video will constitute child pornography. However, where sexual contact is not depicted – and especially where a child is too young to express an attitude that in someone older would seem to express coyness or sexual desire – it may be more difficult to discern whether an image is innocent or pornographic.

Petitioner Roseberline Turenne took eight photographs of very young girls who were in her care when she worked as an aide at a daycare facility. All eight photos showed the children's naked genitals and pubic areas. None of the photos showed the children's faces. None of the photos depicted any sexual contact. On the day the photographs were discovered, Ms. Turenne told investigators that she took the photos for "no reason" and that the photos had "no meaning."

Based on the eight photos, Ms. Turenne was charged with: eight counts of child sex abuse, in violation of Md. Code, Crim. Law ("CR") § 3-602(b)(1) (2021 Repl. Vol.); eight counts of production of child pornography, in violation of CR § 11-207(a)(1); and eight counts of possession of child pornography, in violation of CR § 11-208(b)(2).[1] The State's theory was that the photos were child pornography because they constituted lascivious exhibitions of the children's genitals. With respect to the child sex abuse charges, the State contended that Ms. Turenne sexually exploited the children by taking the photos to obtain sexual gratification.

At her jury trial, Ms. Turenne testified that the reason she took the photos had nothing to do with sexual gratification. Rather, she told the jury, she took the photos to document diaper rashes that she saw on each of the children. The jury found Ms. Turenne guilty on all counts. The Appellate Court of Maryland affirmed Ms. Turenne's convictions.

As discussed below, we conclude that the evidence was sufficient for the jury to conclude that Ms. Turenne took the photos of the children for the purpose of sexual gratification. Therefore, we shall affirm Ms. Turenne's convictions for child sexual abuse.

With respect to the child pornography charges, we hold that whether an image constitutes a "lascivious exhibition" of a child's genitals or pubic area is determined by applying a "content-plus-context" test under which the trier of fact considers: (1) the contents of the image; and (2) the context of the image, *i.e.*, the totality of the circumstances

---

[1] CR § 11-208(b)(2) was renumbered without any change to the text as CR § 11-208(b)(1)(ii) when the statute was amended in 2023. We will refer to the section under which Ms. Turenne was charged with possession of child pornography as CR § 11-208(b)(2).

that directly relate to the exhibition of the genitals or pubic area. After reviewing the contents and context of a contested image, the trier of fact must determine whether the image is objectively sexual in nature.

Applying that analysis to this case, we conclude that the evidence was sufficient for the jury to conclude that the photos at issue depicted the lascivious exhibition of the children's genitals and pubic areas. Accordingly, we also affirm Ms. Turenne's convictions for production and possession of child pornography.

# I

## Background

### A. Facts

We provide the following factual summary, based on the evidence introduced at trial and viewed in the light most favorable to the State, as the prevailing party. *See, e.g.*, *State v. Krikstan*, 483 Md. 43, 63 (2023).

#### 1. The Discovery of the Photographs

On June 10, 2021, Ms. Turenne was working at a daycare center ("the Center"), in Salisbury, Maryland, as a teacher's aide. The Center cares for children between eight weeks and five years old and groups the children into classrooms based on age. Teachers' aides "float" between classrooms and assist the teachers as needed. Teachers and aides change children's diapers throughout the course of the day.

Ms. Turenne, who was 18 years old on June 10, 2021, worked primarily in the toddler area of the Center, but also floated among different classrooms, particularly in the afternoon as teachers left for the day. On the afternoon of June 10, Ms. Turenne handed

3

her cellphone to Nadasia Miller, another aide at the Center, while the two women were together in the Center's break room. Ms. Turenne gave Ms. Miller her phone so that Ms. Miller could view an adult pornographic video on the phone. After watching a portion of the video that Ms. Turenne wanted her to see, Ms. Miller noticed several photographs in the camera roll of Ms. Turenne's phone. As Ms. Miller described them at trial, those photos displayed children's "vaginas." One of the images that Ms. Miller saw showed a child on what Ms. Miller recognized as one of the Center's changing tables. Another image showed a child standing in one of the Center's bathrooms; Ms. Miller recognized the bathroom floor. After realizing that these photos had been taken at the Center, Ms. Miller gave Ms. Turenne her phone back, left the break room, and immediately reported what she had seen to the Center's manager, Barbara Brittingham. Ms. Brittingham then contacted Child Protective Services.

2. The Interview of Ms. Turenne

Later in the afternoon on June 10, Detective M. Rockwell[2] of the Salisbury City Police Department and Amy Kelly, a social worker, arrived at the Center and interviewed Ms. Turenne.[3] Detective Rockwell obtained Ms. Turenne's consent to make an audio recording of the interview. At the outset of the interview, Ms. Turenne denied that there were any pictures of children in her phone. Ms. Turenne unlocked her cellphone and

---

[2] Only the first initial of Detective Rockwell's first name is included in the record.

[3] Detective Rockwell and Ms. Kelly worked together at the Wicomico County Child Advocacy Center ("CAC"). The CAC is comprised of therapists, law enforcement officers, and social workers who investigate allegations of physical and sexual abuse of minors in Wicomico County.

consented to Detective Rockwell viewing the images on the phone. Detective Rockwell then inspected the camera roll of Ms. Turenne's phone.

The first image that Detective Rockwell asked Ms. Turenne about was, according to Ms. Turenne, not an image of a child. Ms. Turenne said that item was created on TikTok and sent by another person to her as part of a group message. Detective Rockwell seemed to agree that this TikTok item did not involve a child, because he then explained that he "just want[ed] to make sure there's no little kids on [Ms. Turenne's] phone."

However, as Detective Rockwell continued to scroll through Ms. Turenne's camera roll, he discovered several pictures displaying the genitals and pubic areas of children who looked to be of infant or toddler age. When Detective Rockwell showed Ms. Turenne the picture of a "baby" that he saw in the camera roll, Ms. Turenne claimed that the image was not of a baby and that she had obtained it from Google. Detective Rockwell then showed Ms. Turenne another picture of a child in her camera roll and said, "See, that's a child." Ms. Turenne claimed that picture also was not of a child. Ms. Turenne said the pictures had been sent to her by others through the application WhatsApp and automatically downloaded to her camera.

After Ms. Turenne offered these explanations, Detective Rockwell left the room, taking Ms. Turenne's phone with him. He then walked around the Center with Ms. Brittingham and photographed several of the Center's changing tables. Only one changing table was located in a bathroom in the Center; the top of that changing table was fitted with a red mat. It appeared to Detective Rockwell that some of the children in the photos on Ms.

5

Turenne's phone had been photographed while lying on changing tables that he saw while walking around the Center.

Detective Rockwell then returned to the room where Ms. Turenne and Ms. Kelly were located. He asked Ms. Turenne, "Were any of the nude pictures of the children taken in this building?" Ms. Turenne replied, "To tell you the truth, yes." Ms. Turenne told Detective Rockwell and Ms. Kelly several times that she did not know why she had taken the pictures, that she had taken them for "no reason," and that there was "no meaning" to the pictures. Ms. Turenne also repeatedly told the investigators that she had intended to delete the photos from her phone but had forgotten to do so. Ms. Turenne stated that she never sent the images of the children to anyone else or sold them, and that the pictures were just for herself.

Ms. Turenne was terminated from her job at the Center on June 10, 2021. Detective Rockwell retained Ms. Turenne's cellphone as evidence. A forensic extraction of data from Ms. Turenne's cellphone yielded eight distinct images of very young nude girls, all of which focused on the girls' genitals and pubic areas.

### B. Trial

On June 28, 2021, a grand jury in Wicomico County charged Ms. Turenne in a 24-count indictment relating to the eight photographs of nude children found on her phone. Each photograph was the basis for three charges: Counts 1-8 charged Ms. Turenne with sexual abuse of a minor, in violation of CR § 3-602(b)(1);[4] Counts 9-16 charged Ms.

---

[4] CR § 3-602(b)(1) provides: "A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause

Turenne with producing child pornography, in violation of CR § 11-207(a)(1);[5] and Counts 17-24 charged Ms. Turenne with possession of child pornography, in violation of CR § 11-208(b)(2).[6]

Ms. Turenne's trial went forward in the Circuit Court for Wicomico County on March 29 and 30, 2022. In his opening statement, Ms. Turenne's attorney told the jury that they would see pictures of children with "rashes in their private parts" and "with diaper cream on." He further stated that Ms. Turenne took the photos in question because she was "afraid of being accused of any kind of rashes that she wasn't taking care of, she wasn't wiping."

In the State's case-in-chief, Ms. Miller testified that she saw the images of nude children on Ms. Turenne's camera roll and that she reported what she saw to the Center's manager, Ms. Brittingham. Ms. Brittingham testified about the Center's operations, and explained that the Center prohibits its staff from taking photographs of the children in the Center. Ms. Brittingham stated that there were no cameras located in the Center's

---

sexual abuse to the minor." "Sexual abuse" is defined as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." *Id.* § 3-602(a)(4)(i).

[5] CR § 11-207(a)(1) provides: "A person may not … cause … a minor to engage as a subject in the production of … a visual representation … that depicts a minor engaged as a subject in … sexual conduct[.]" As relevant here, "sexual conduct" includes "lascivious exhibition of the genitals or pubic area of any person." *Id.* § 11-101(d)(4).

[6] At the time Ms. Turenne was charged, CR § 11-208(b)(2) provided: "A person may not knowingly possess and intentionally retain a … photograph, or other visual representation showing an actual child … under the age of 16 years … engaged in sexual conduct[.]" For purposes of CR § 11-208(b)(2), "sexual conduct" also included "lascivious exhibition of the genitals or pubic area of any person." *Id.* § 11-101(d)(4).

7

bathrooms. Ms. Brittingham further testified that she has never asked staff to document diaper rash on any children by taking pictures, and she confirmed that taking a picture of a child at the Center for that purpose would be contrary to the Center's policy prohibiting the taking of pictures of children.

Detective Rockwell testified about the interview of Ms. Turenne that he and Ms. Kelly conducted at the Center on June 10, 2021. Among other things, he recounted how Ms. Turenne initially claimed that other people had sent her the images of the nude children. Detective Rockwell's photographs of the changing tables were admitted in evidence, including photographs of a changing table with a red mat that was located in the Center's two- and three-year-old bathroom. Detective Rockwell also testified that Ms. Turenne eventually admitted that she had taken the photos of the nude children. The State introduced into evidence the audio recording of Detective Rockwell's and Ms. Kelly's interview of Ms. Turenne, and played portions of it for the jury.

Detective Rockwell also testified about receiving the extraction of Ms. Turenne's cellphone. He explained that the data he received in the extraction contained 145,047 pictures, and that he viewed all of those pictures. Detective Rockwell testified that, among the extracted photos, he was able to locate the same images he had seen while looking through the phone's camera roll during the interview of Ms. Turenne.

The State introduced into evidence eight images of nude children found in the extraction of Ms. Turenne's cellphone. The eight photographs were taken between February 8, 2021 and April 22, 2021. All but one of the photographs were taken in the late

8

afternoon or early evening hours. Several of the photographs were taken in a bathroom at the Center. We provide the following additional details about each photograph:

*Photograph of child designated as J-1*: The photograph of J-1 shows her lying on her back on what appears to be the changing table with the red mat,[7] which was located in the two- and three-year-old bathroom. J-1's naked genitals and pubic area are located in the center of the picture. Some redness appears to be visible on both sides of the vulva. J-1's face and upper body are not included in the picture. Just above J-1's bellybutton, the bottom portion of a pink sweater or shirt is visible. Portions of J-1's legs are visible, as are portions of pink socks she is wearing.

*Photograph of child designated as J-2*: The photograph of J-2 shows her standing up in one of the Center's bathrooms. J-2 is naked from approximately her sternum to her knees. Her face and upper body are not included in the picture. J-2's genitals and pubic area are located in the center of the picture. No rash or redness is visible on J-2's body. Black pants and pink underwear are pulled down below J-2's knees.

*Photograph of child designated as J-3*: The photograph of J-3 shows her lying on her back on what appears to be a brown paper towel, which has been placed on what appears to be a changing table with a white or beige surface. J-3's naked genitals and pubic area are located in the center of the picture. There appears to be diaper cream spread around J-3's anal area. J-3's face is not visible in the photograph.

*Photograph of child designated as J-4*: The photograph of J-4 shows her lying on her back on what appears to be a portion of a diaper. The surface underneath the diaper appears to be beige in color. J-4's naked genitals and pubic area are located in the center of the picture. No rash is visible, but there appears to be some slight redness in the genital area. J-4's face is not visible in the picture. The picture appears to be zoomed in to focus on J-4's genitals. Located a short distance from J-4's genitals is an unidentified object, the surface of which appears to be covered in blue fabric.

---

[7] Based on all the evidence admitted at trial, the jury could conclude that Ms. Turenne took seven of the eight photos at issue in this case while the child in question was lying on a changing table. However, based on the contents of the images alone, it would be impossible to determine with respect to several of the photos that the children were lying on a changing table, as opposed to another type of surface.

*Photograph of child designated as J-5*: The photograph of J-5 shows her lying on her back on what appears to be a brown paper towel, which has been placed on what appears to be the red-matted changing table in the two- and three-year-old bathroom. J-5's naked genitals and pubic area are located in the center of the picture. No rash is visible, but some slight redness appears to be visible on both sides of the genital area and around the anal area. J-5's face and most of the rest of her body are not included in the picture. The picture appears to be zoomed in to focus on J-5's genitals.

*Photograph of child designated as J-6*: The photograph of J-6 shows her lying on her back on what appears to be the red-matted changing table located in the two- and three-year-old bathroom. J-6's naked genitals and pubic area are displayed in the center of the picture. No rash is visible, but some slight redness appears to be visible on both sides of the genital area and around the anal area. J-6's face and most of the rest of her body are not included in the picture. The picture appears to be zoomed in to focus on J-6's genitals.[8]

*Photograph of child designated as J-7*: The photograph of J-7 shows her lying on her back on what appears to be the red-matted changing table located in the two- and three-year-old bathroom. J-7's naked genitals and pubic area are displayed in the center of the picture. J-7's thighs are visible in the picture. No rash or redness is visible in the photo. J-7's face and upper body are not included in the picture. The top of the image ends below J-7's bellybutton; the bottom portions of a blue shirt that J-7 is wearing are visible on the sides of her body, near her hips. The bottom of the picture ends above J-7's kneecaps.

*Photograph of child designated as J-8*: The photograph of J-8 shows her lying on her back on what appears to be a paper towel, which has been placed on what appears to be the red-matted changing table in the two- and three-year-old bathroom. J-8's naked genitals are the focus of the picture. No rash or redness is visible in the picture. J-8's face and most of the rest of her body are not included in the picture. The picture appears to be zoomed in to focus on J-8's genitals. This picture was taken at 11:08 a.m.,

---

[8] The photographs of J-5 and J-6, including the slight redness in the pubic area, are very similar. Both images are close-ups of a child's genitals, but the photograph of J-5 shows a little more of the child's body than does the photo of J-6. In addition, J-5 is lying on top of a brown paper towel. No brown paper towel is visible in the photo of J-6. Detective Rockwell testified that, according to the metadata for the images of J-5 and J-6, both photographs were taken on April 14, 2021 at 5:28 p.m. It may well be that J-5 and J-6 are the same child, but the photos do not appear to be duplicates.

the only one of the eight photos that was taken before approximately 4:30 p.m.

No images of nude boys were found on Ms. Turenne's phone. Detective Rockwell testified that both male and female children attended the Center during the time that Ms. Turenne worked there.

Detective Rockwell also testified on direct examination, without objection, that the cellphone extraction revealed the existence of adult pornography – with both male and female subjects – on Ms. Turenne's phone. On cross-examination, Ms. Turenne's attorney elicited from Detective Rockwell that there were a "handful" of adult nude females and a "handful" of adult nude males in images contained on Ms. Turenne's phone. Detective Rockwell also testified that investigators found no messages from Ms. Turenne to anyone else concerning the images of the children on her phone, nor did investigators find any evidence that Ms. Turenne had conducted any internet searches for child pornography.

Ms. Turenne testified in her own defense. She told the jury that she took the pictures of the children because they had diaper rashes, and she wanted to "protect [her]self so [she] [would not] get in trouble." That is, she wanted to be able "to prove that this child had the rash before I started watching the child."

Ms. Turenne further testified that, when she told Detective Rockwell that she had received images via the Internet, she thought he was asking about the adult pornographic pictures in her phone. She said that she did not tell Detective Rockwell during the interview that she had taken the pictures of the children to document diaper rash because: "I was

scared, ... he [was] saying child pornography, ... I'm guessing am I in trouble because, like, am I gonna get deported?"[9]

On cross-examination, Ms. Turenne testified that she only took a picture of a child if she saw a rash, and she did not recall any boys having a diaper rash. Ms. Turenne acknowledged that she would not be able to identify any of the children based on the photos she took because she did not include any of their faces in the images.

The prosecutor also asked Ms. Turenne, without objection, if she told Ms. Miller that she was attracted to females. Ms. Turenne answered that she did not recall telling Ms. Miller that. The prosecutor then asked, again without objection: "Is it a fair statement that you are attracted to women?" Ms. Turenne replied: "I wouldn't say attracted to women, like, I will say, ... like, I'm bisexual, like, I'm still confused about what I like between men or women. But not children, no." The prosecutor then asked, without objection, more questions about the adult pornography on Ms. Turenne's phone. In response to being asked whether she received "some kind of sexual gratification" from watching the adult pornography that was on her phone, Ms. Turenne testified: "I'm kind of attracted to them but not really because, like I say, I'm still confused about what I like or not."

In its rebuttal case, the State recalled Ms. Miller, who testified (without objection) that Ms. Turenne told her "that she was gay." The State also recalled Ms. Brittingham, who testified that no teacher or aide was ever reprimanded or otherwise got in trouble for a child having a diaper rash.

---

[9] Ms. Turenne is an immigrant.

In her closing argument, the prosecutor observed, among other things, that none of the pictures Ms. Turenne took were of boys, that she included no faces in the pictures, and that she did not mention any concern about diaper rash in her interview with the investigators. The prosecutor also stated, without objection from the defense:

> It's interesting that apparently no boys had rashes at the time. She told [Ms. Miller] that she was gay or bisexual, which, obviously doesn't matter, but it matters when you're looking at whether she had any sexual gratification for taking these pictures, holding on to these pictures for as long as she did.

In his closing argument, defense counsel contended that the State had not proved that Ms. Turenne had a "sexually-based intent" in taking the photos of the children or that the photos contained any "sexual exhibition." Defense counsel stated that the Center was correct to terminate Ms. Turenne's employment for having taken the photos, but that the jury should credit Ms. Turenne's account that she took the photos to document instances of diaper rash.

With respect to the evidence of adult pornography and the evidence concerning Ms. Turenne's sexual orientation, defense counsel told the jury:

> I could have said, you know what, it's going to be prejudicial to the jury, the jury is going to be so blinded by the fact that she was looking at pornography, I don't want them to even know about that, I could have made that argument. But I wanted to, I wanted you all to see that because, again, there's nothing to hide in this case. Her preferences are in men and women. Now, the State is saying that she was gay and look at the pictures and they're trying to imply that because you're gay somehow you then become an abuser. But here's the thing they don't mention. There's pictures of male genitalia, too, of adult male genitalia. They don't mention that. They're making the argument that she's gay, but she has male genitalia in these pictures. And she even said herself, I'm bisexual.

(Paragraph breaks omitted).

13

In her rebuttal argument, responding to defense counsel's claim that the State was arguing that "because you're gay somehow you then become an abuser," the prosecutor stated (again with no objection):

> There's no inference made by the fact that she would be gay or bisexual. That's irrelevant. The only reason we're considering that is the inference that she has sexual gratification and that that connects to the pictures themselves. That's why it becomes relevant. Nobody is making any inference from it.
>
> …
>
> These pictures may not mean anything to us other than just make us uncomfortable, but obviously to some people out there who are voyeurs or pedophiles, they bring a gratification and we can only infer that from the pictures themselves because the children can't tell us what her intent, and really it's hard to know what anybody's intent is, so we look at the evidence itself.

The jury found Ms. Turenne guilty on all counts. The court subsequently sentenced Ms. Turenne to a total of 280 years of imprisonment, suspending all but 126 years,[10] to be followed by five years of supervised probation.

---

[10] The court imposed consecutive statutory-maximum 25-year sentences on each of the child sex abuse counts (Counts 1-8). With respect to Counts 1 and 7, the court suspended no portion of the 25-year sentences. With respect to Counts 2-6 and 8, the court suspended all but 10 years of each 25-year sentence. The court imposed consecutive statutory-maximum 10-year sentences on each of the production-of-child-pornography counts (Counts 9-16), suspending all but two years of each of those sentences. The court properly determined that, for sentencing purposes, the convictions for possession of child pornography merged into the convictions for production of child pornography. Ms. Turenne's sentence is not before us in this case.

The docket reflects that, although Ms. Turenne was advised of post-trial rights, she did not file a request for review of her sentence by a three-judge panel. *See* Md. Code, Crim. Proc. § 8-102; Md. Rule 4-344(a). Nor did she file a motion for modification of her sentence under Maryland Rule 4-345(e).

## C. Appeal

In a reported opinion, the Appellate Court of Maryland affirmed Ms. Turenne's convictions. *Turenne v. State*, 258 Md. App. 224 (2023). With respect to the child pornography charges, the Appellate Court considered the approach of multiple courts around the country in interpreting the meaning of "lascivious exhibition" of children's genitals and pubic areas in statutes using the same or substantially similar language. *Id.* at 240-46. The Appellate Court found most persuasive the position of those courts that "rely on the plain meaning of 'lascivious exhibition' and apply a totality of the circumstances approach, which is most appropriate given the varied and nuanced contexts of child pornography." *Id.* at 247. The Appellate Court reasoned that "[t]he plain meaning of 'lascivious exhibition' requires that we ask whether the [image] depicts the minor's genitals or pubic area in order to excite lustfulness or sexual stimulation in the viewer." *Id.* (cleaned up) (citations omitted). The Appellate Court continued: "Answering this question requires consideration of all circumstances surrounding a depiction; not just the image itself, but the actions and preferences of the defendant." *Id.*

Applying a totality-of-the-circumstances test, the Appellate Court affirmed Ms. Turenne's convictions for production and possession of child pornography. *Id.* at 249-52. Among other things, the Appellate Court opined:

> Regarding the content of the photos themselves, all are taken of female infants. Each photo is zoomed in to focus, indisputably, on the child's unclothed vagina as she lies on a changing pad or stands in a bathroom. The photos contain nothing else, aside from, in a few photos, the child's stomach and upper thighs. Most photos, if not all, do not depict any apparent diaper rash. None of the photos contain faces.

15

Regarding Turenne's motive for taking the photos, seven of the eight photos were taken at times in the evening after teachers would begin to leave the daycare for the day. Some were taken in the bathroom. No teacher would be in the bathroom if an aide, such as Turenne, was already in there with a child, because the teacher would be in the classroom with the rest of the children. Turenne initially lied to the investigators by stating that the photos were from the internet, not of children in the daycare. The reasoning she ultimately alleged for taking the photos – that she was documenting diaper rash – was not offered at the initial interview. Turenne also testified that she would be unable to identify a child based on the photos….

The camera roll on Turenne's phone on which the photos were contained also contained adult pornography. It was an adult pornographic video that Turenne was showing to a co-worker when the co-worker discovered the eight photos at issue.

Based on the times and places the photos were taken, a reasonable juror could conclude that Turenne surreptitiously took the photos, and that she was discreet because she knew taking and possessing pictures of the children's vaginas was impermissible. A reasonable juror could infer Turenne's knowledge that what she did was impermissible and even morally – and perhaps legally – wrong, based on her initial lies to investigators about where the photos came from. A reasonable factfinder could conclude that Turenne was not credible when she claimed she took the photos to document diaper rash….

A reasonable juror could also infer that Turenne took these photos for sexual gratification, based on the photos' exclusive focus on the children's vaginas and the absence of any credible, innocuous reason for taking and storing such photos, and the photos' location among other pornographic images on Turenne's phone.

*Id.* at 249-50.

The Appellate Court also affirmed Ms. Turenne's convictions for sexual abuse of a minor through sexual exploitation of the children in the images. *Id.* at 252-57. The Appellate Court concluded that the State introduced sufficient circumstantial evidence to allow a rational juror to conclude that Ms. Turenne derived sexual gratification from taking the photos. *See id.* at 255. In this regard, the Appellate Court pointed to "the combination

16

of the surreptitious manner in which she took the photos, the photos' location in her camera roll among adult pornography, that she shared some of that adult pornography on her phone with a co-worker, and the absence of any credible, innocuous reason for taking photos of children's genitalia in violation of the daycare's policy." *Id.* The court noted that, although Ms. Turenne at trial provided an explanation for taking the photos (documenting diaper rash), a rational juror "could have found it incredible …, which is, in fact, what the jury did." *Id.* at 256.

The Appellate Court further held that the circuit court did not commit plain error by: (1) failing to instruct the jury on the meaning of "lascivious exhibition" for purposes of the child pornography-related charges; and (2) failing to explain what constitutes "sexual exploitation" for purposes of the child sexual abuse charges. *Id.* at 259-61.

Finally, the Appellate Court held that the trial court did not plainly err by allowing the prosecutor to make comments in her closing argument and rebuttal argument concerning Ms. Turenne's sexual orientation. *Id.* at 263. The Appellate Court explained:

> [T]he impact of the prosecutor's comments, particularly her rebuttal, though mentioning Turenne's sexual orientation, focused on explaining Turenne's interest in female children. In other words, the prosecutor was not arguing that Turenne was probably a child abuser because she was lesbian or bisexual, but rather that her sexual attraction to women might mean that she was sexually attracted to girls – which in turn, would explain the photos she took exclusively of female infants' genitalia. Though this point is debatable, it is not plainly wrong, particularly in the absence of an objection and given the substantial latitude that lawyers have in closing argument.

*Id.* at 263-64.

The Appellate Court cautioned, however, "that the prosecutor's comments could be misinterpreted. Linking one's sexual orientation, particularly a same-sex orientation, to

17

sexually abusing children is a canard that reinforces a terrible stereotype of gay and lesbian people." *Id.* at 264. The Appellate Court observed that "the prosecutor's comments, though perhaps unintentional, came dangerously close to perpetrating a pernicious falsehood about same-sex orientation and should be avoided." *Id.*

On August 14, 2023, Ms. Turenne filed a petition for writ of certiorari, seeking review of several issues. On October 23, 2023, we granted Ms. Turenne's petition in part, *Turenne v. State*, 486 Md. 147 (2023), agreeing to review the following question and its two subparts:

> Is the evidence insufficient to sustain the child pornography convictions under [CR] §§ 11-207(a)(1) and -208(b) and child sex abuse convictions under [CR] § 3-602(b)?
>
> (A) What is the appropriate test to determine whether an image constitutes "lascivious exhibition of the genitals" under the child pornography statutes?
>
> (B) What role, if any, does evidence of possession of adult pornography play in assessing the sufficiency of the evidence?[11]

## II

### Standard of Review

When reviewing whether evidence is sufficient to support a conviction, "we view the evidence in the light most favorable to the State and assess whether any rational trier

---

[11] Ms. Turenne's petition also requested that we review whether the trial court plainly erred "by allowing the prosecutor to impermissibly appeal to the prejudices of the jury by invoking homophobic tropes based on testimony, elicited by the prosecutor, that Petitioner was gay or bisexual[.]" Ms. Turenne's petition also sought plain error review concerning the jury instructions and a jury note. We declined to grant review of these additional issues.

of fact could have found the essential elements of the crime beyond a reasonable doubt." *Krikstan*, 483 Md. at 63 (internal quotation marks and citations omitted). We do not "undertake a review of the record that would amount to, in essence, a retrial of the case," *Rivers v. State*, 393 Md. 569, 580 (2006) (internal quotation marks and citation omitted), and we do not "re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence." *Walker v. State*, 432 Md. 587, 614 (2013) (internal quotation marks and citations omitted). Instead, we defer to "reasonable inferences drawn by the fact-finder" and "resolve conflicting possible inferences in the State's favor." *Krikstan*, 483 Md. at 64.

Part of our inquiry in this case involves the interpretation of statutory language. That presents a question of law, which we review *de novo*. *Id.*

### III

### Discussion

### A. Counts 1-8: Sexual Abuse of a Minor

We first consider the sufficiency of the evidence in support of Ms. Turenne's convictions on Counts 1-8 for sexual abuse of a minor, in violation of CR § 3-602(b)(1).

Section 3-602(b)(1) prohibits someone "who has permanent or temporary care or custody or responsibility for the supervision of a minor" from causing "sexual abuse to the minor." "Sexual abuse" is defined as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." *Id.* § 3-602(a)(4)(i). The State proceeded under the sexual exploitation prong of the definition of "sexual abuse." Thus, to convict Ms. Turenne under § 3-602(b)(1), the State was required to prove with respect to each count that: (1) Ms. Turenne had care, custody, or responsibility for the

19

victim's supervision; (2) the victim was a minor at the time of Ms. Turenne's conduct; and (3) Ms. Turenne sexually exploited the victim by means of a specific act. *See Schmitt v. State*, 210 Md. App. 488, 496 (2013). The only statutory element that Ms. Turenne disputes is whether her conduct in taking the photographs constituted sexual exploitation.

Ms. Turenne contends that, in reviewing the sufficiency of the evidence supporting these convictions, we should not consider the evidence that the State introduced concerning her sexual orientation and her possession of adult pornography. Without such evidence, Ms. Turenne argues, the evidence was insufficient to sustain her child sexual abuse convictions because the State failed to prove that she took the photographs for her own sexual gratification. According to Ms. Turenne, nothing within the four corners of the photos makes it self-evident that she created the images for the purpose of sexual gratification.

The State argues that the evidence was sufficient to show that Ms. Turenne took the photographs for the purpose of sexual gratification. According to the State, a rational juror could reach this conclusion from the photographs themselves, which showed that Ms. Turenne "put a number of the children in stereotypically sexual poses …, laying them on their backs, with legs spread, and genitals prominent." In addition, the State observes, all eight of the photos clearly focused on the children's genitalia and omitted their faces, which could be interpreted by the jury as treating the children as sexual objects. Finally, according to the State, Ms. Turenne's diaper-rash explanation was thoroughly discredited at trial.

We recently reaffirmed that sexual exploitation in the context of child sexual abuse "is not limited to incidents involving physical contact and can include a wide range of

20

behavior." *Krikstan*, 483 Md. at 51 (citation omitted). We have "continually construed § 3-602 in an expansive manner," among other things, clarifying that its coverage "is not limited to the enumerated acts" listed in the statute as examples of sexual abuse.[12] *Walker*, 432 Md. at 622; *see also Tribbitt v. State*, 403 Md. 638, 643, 645 (2008) (holding that "sexual contact that does not constitute a sexual offense in any degree or otherwise violate any provision of Maryland law" can nevertheless provide the basis for sexual abuse under CR § 3-602).

To prove sexual abuse by sexual exploitation, the State must show that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit." *Degren v. State*, 352 Md. 400, 426 (1999) (quoting *Brackins v. State*, 84 Md. App. 157, 162 (1990)). This benefit need not be sexual; in other words, the State is not required to prove that the defendant personally received sexual gratification from the conduct. *Walker*, 432 Md. at 625. For example, in *Walker*, we explained that it did not matter whether the 38-year-old defendant "became sexually aroused or received sexual gratification" from exchanging notes containing sexual undertones with an eight-year-old girl. *Id.* The "great pleasure" that the defendant described deriving from the notes led us to conclude that the defendant "received a benefit from his actions and therefore exploited" the child. *Id.* (internal quotation marks omitted). Additionally, the State is not required to prove an

---

[12] CR § 3-602(a)(4)(ii) lists four examples of "sexual abuse": incest, rape, sexual offense in any degree, and "any other sexual conduct that is a crime." Given that "the purpose of the child abuse statute [is] to protect minors from abuse," *Degren v. State*, 352 Md. 400, 428 (1999), we have explained that "the Legislature intended [this] list of items … to be illustrative," not exhaustive. *See Tribbitt v. State*, 403 Md. 638, 657 n.14 (2008).

adverse impact on the victim or that the victim was aware of the exploitation. *See Schmitt*, 210 Md. App. at 502-03. A benefit to the defendant, whether it is sexual, financial, or otherwise, is all that is required. *See Walker*, 432 Md. at 625.[13]

In assessing whether the State has sufficiently proved an act of sexual exploitation, we examine not only the specifics of the alleged act itself, but also the pertinent circumstances relating to the act. *See Walker*, 432 Md. at 622 ("The context in which the abuse occurs matters[.]"). We view the facts surrounding alleged sexual exploitation "in their totality[.]" *Id.* at 623 (explaining that the context in which a male paraeducator wrote notes to an elementary school student "certainly informs the interpretation" of the notes). This "content-plus-context" approach is consistent with the General Assembly's clear intent to protect child abuse victims. Since Maryland's first child abuse statute was enacted in 1963, the General Assembly has repeatedly broadened the statutory definition of abuse. *See Krikstan*, 483 Md. at 68-70 (detailing changes in Maryland's child abuse statutes over time). This "concern for the welfare of children, and the myriad ways in which abusers can sexually exploit minors, militates against unduly narrowing the scope of a statute that is reasonably worded so as to reach a wide swath of behaviors." *Walker*, 432 Md. at 623. Considering the context in which allegedly sexually exploitative acts were committed, as well as the acts themselves, furthers the Legislature's purpose to protect children from sexual abuse.

---

[13] The State's theory at trial was that the benefit from taking the photos of the children was Ms. Turenne's own sexual gratification. Accordingly, that is our focus here as well. We do not consider whether the evidence admitted at trial showed that Ms. Turenne received any other kind of benefit from taking the photos.

In *Scriber v. State*, the Appellate Court applied a content-plus-context approach to a sexual exploitation case involving photographs. 236 Md. App. 332 (2018). The defendant in *Scriber* was a high school teacher who took pictures of students' clothed buttocks in a classroom. *See id.* at 337-39. After being found guilty in a non-jury trial of child sexual abuse under CR § 3-602(b)(1), the defendant argued on appeal that the "mere taking of a picture of a fully clothed individual" was not sufficient to prove sexual exploitation. *Id.* at 349.

The Appellate Court affirmed the defendant's conviction. The Appellate Court opined that the defendant's "framing of the issue, whether the mere taking of a picture of a fully clothed individual is sufficient to prove sexual exploitation, is too narrow." *Id.* (cleaned up). Rather, the court stated, "our analysis requires consideration of all the circumstances, including the *context* in which the pictures were taken, i.e., [the defendant] was a high school teacher and the [victim] was his student, and the *content* of the pictures, which the circuit court accurately described as multiple images of [the victim] 'bending over, taking the picture from the back to the virtual exclusion of every other part of her body.'" *Id.* (emphasis added).

Applying that broader analytical approach, the Appellate Court agreed with the trial court that the evidence was sufficient to show that the defendant's actions were sexually exploitative:

> Based on the context of the actions, a teacher taking multiple photos of a student during school, and the content of the photos, which depicted primarily the buttocks of a student bending over what appears to be a table, as well as other photos depicting only a "young woman's legs and buttocks," a rational trier of fact could conclude that [the defendant]'s actions in taking

> these photos were for his own benefit and constituted exploitation of a sexual nature.

*Id.* at 350; *see also id.* at 349-50 (agreeing with the trial court's conclusion that the photographs' focus on the victim's buttocks was "not an accident").

Applying the appropriate content-plus-context approach to this case leads to the same result. A reasonable juror could have determined that Ms. Turenne took photographs of multiple naked children for her own benefit. First, like the photos in *Scriber* that focused on students' buttocks, *id.* at 337-39, Ms. Turenne's photos focused on the children's genitals. That all eight photos focused on the children's genitals could allow a reasonable factfinder, as in *Scriber*, to conclude that the composition of any one or more of the photos was not an accident, *id.* at 349-50, but rather was designed for sexual gratification.

Second, a reasonable juror could have concluded that Ms. Turenne purposely put several of the children in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals. This also could have caused a reasonable juror to infer that Ms. Turenne took those photos for her own sexual gratification.

Third, as the State points out, the fact that Ms. Turenne omitted the children's faces from all the photos could support a reasonable juror's determination that Ms. Turenne treated the children as sexual objects. Indeed, there have been many cases around the country where images of child pornography (or suspected child pornography) have similarly omitted faces. *See*, *e.g.*, *United States v. Hammond*, 779 F. App'x 835, 839 (3d Cir. 2019) (noting that "[no] faces can be seen in the images" of child pornography); *State*

24

*v. Sewell*, No. 22-798, 2023 WL 2592018, at *2 (La. Ct. App. Mar. 22, 2023) ("Agents asked whether he saw child porn when he downloaded, and he said it was hard to tell because there were no faces, but he confirmed there were vaginas and undeveloped prepubescent [breasts] shown."); *People v. Olsen*, No. 4-22-0738, 2023 WL 5049096, ¶¶ 19-20 (Ill. App. Ct. Aug. 7, 2023) (noting video of child pornography where no faces can be seen); *Anderson v. Clarke*, No. 7:22-cv-00272, 2023 WL 6456489, at *4 (W.D. Va. Sept. 30, 2023) (noting that some of the purported images of child pornography "only revealed genitalia, with 'no faces,'…"); *United States v. Jones*, 748 F.3d 64, 66 (1st Cir. 2014) (undercover agent agreeing with target that target would commit sex acts on a child, while the agent would "perhaps film what [the target] did – 'close up' shots only, … 'no face' shots").

Fourth, Ms. Turenne violated the Center's no-photograph policy to take these pictures and took most of them after teachers began leaving for the day, when there were fewer staff members in the building. She also took several pictures in a bathroom, secluding herself and the children from other adults and from the Center's cameras.

Fifth, Ms. Turenne initially lied to the investigators about whether two of the images were photos of children and falsely denied having taken those pictures. After admitting that she did take the pictures of the nude children that were on her phone, Ms. Turenne repeatedly told the investigators that she took the pictures for "no reason," and that she had meant to delete the pictures but had forgotten to do so. And, as the State notes, Ms. Turenne's diaper-rash explanation, which she raised for the first time at trial, was

25

thoroughly discredited.[14] All of these circumstances provide additional support for the jury's determination that Ms. Turenne indeed took the pictures and retained them for a reason: sexual gratification.[15]

---

[14] One of the photos shows diaper cream applied to a child's anal area. No rashes are visible in several photos. A few photos show, at most, redness of varying degrees. One child is shown with a pair of underwear below her knees, indicating that she is no longer wearing diapers. Regardless of what a rational juror may have concluded about the number of pictures in which a rash was visible, such a juror could have concluded that Ms. Turenne did not take any of the photos to document a rash or an incipient rash. For one thing, a rational juror could have found Ms. Turenne's claim that she saw no diaper rashes on boys to be far-fetched. In addition, as Ms. Turenne acknowledged in her trial testimony, she would not have been able to identify any of the children in the faceless images if a parent had complained about a diaper rash. Moreover, it is difficult to understand how most of these photos, even if they had included the children's faces, would have helped Ms. Turenne respond to a complaint about a diaper rash. She took most of the photos at the end of day, at a time when the pictured child presumably would have been at the Center for several hours. If, as Ms. Turenne testified, she wanted "to prove that this child had the rash before I started watching the child," presumably she would have taken pictures of rashes that were visible during the child's first diaper change of the day. In addition, only one photo showed the application of diaper cream. If, as defense counsel said in his opening statement, Ms. Turenne's goal was to show that she was "afraid of being accused of any kind of rashes that she wasn't taking care of, she wasn't wiping," presumably Ms. Turenne would have taken more photos that documented her use of diaper cream. Finally, a rational juror could have concluded from the fact that Ms. Turenne retained the photos on her phone long after a parent or guardian likely would have complained about any rash or redness shown in any of the photos, that Ms. Turenne took them for a purpose other than to protect herself against a claim of substandard care.

[15] Contrary to Ms. Turenne's assertion, our decision in *Bible v. State* does not compel a different result. In *Bible*, we overturned the defendant's convictions for sexual offenses in the third and fourth degrees. 411 Md. 138 (2009). The alleged victim in that case, who was seven years old at the time of the offense, testified that the defendant touched her "behind" more than once for "like two seconds." *Id.* at 146. The State introduced no other evidence regarding the alleged touching and the surrounding circumstances. *Id.* at 145. A three-judge plurality of the Court joined an opinion holding that: (1) a person's buttocks are an "intimate area" for purposes of the third- and fourth-degree sex offense statutes, *id.* at 152-56; but (2) the evidence was insufficient to prove beyond a reasonable

Note that we have not yet discussed the evidence of the adult pornography found on Ms. Turenne's phone as part of our sufficiency analysis. That is not because evidence of a defendant's possession of adult pornography is never relevant in a child sex abuse case. As Ms. Turenne acknowledges in her briefing, in some instances such evidence is relevant. *See, e.g.*, *Commonwealth v. Wallace*, 877 N.E.2d 260, 262-63, 267-68 (Mass. App. Ct. 2007) (in prosecution for indecent assault and battery on 12-year-old girl, affirming admission of adult pornography that was found in defendant's car commingled with photographs of fully clothed young girls and other items that collectively showed a "voyeuristic interest in sexual matters and young females"; such evidence was probative of "whether the defendant intentionally squeezed the victim's breast or accidentally touched her while in the performance of a good deed"); *Ortiz v. Commonwealth*, 667 S.E.2d 751, 755 (Va. 2008) (in prosecution for rape of the defendant's step-grandchild, affirming admission of adult pornographic videos found in search of the defendant's home, where they were relevant to corroborate the child's testimony that, during the period of the

---

doubt that the defendant's intent in touching the girl's buttocks was to obtain sexual arousal or gratification. *Id.* at 156-60.

The Honorable Lynne A. Battaglia and the Honorable John C. Eldridge joined in the judgment only. *Id.* at 161. (The Honorable Glenn T. Harrell, Jr., joined by the Honorable Joseph F. Murphy, Jr., filed a dissenting opinion. The dissenters would have affirmed the convictions. *Id.* at 161-63 (Harrell, J., dissenting.)) Thus, we cannot conclude that a majority of the Court in *Bible* determined the evidence was insufficient to support the jury's finding regarding the defendant's intent. Regardless, the evidence of sexual gratification was more robust in this case than it was in *Bible*. As the State points out, "there is a big difference between touching for 'like two seconds' on top of clothing, and several naked, sexually posed, genitalia-focused photos taken on different dates."

alleged sexual abuse, the defendant "showed her movies of 'grownups doing something' without clothes on").

Here, the evidence of adult pornography on Ms. Turenne's phone – all of which came in without objection – was relevant to the jury's understanding of how Ms. Miller first came to see the photos of the children. It also was relevant insofar as it was a topic of discussion during Ms. Turenne's interview with the investigators, a recording of which was introduced into evidence. However, it is a closer question whether the evidence of adult pornography, as offered by the State, had probative value with respect to whether Ms. Turenne obtained sexual gratification from the photos of the children. The jury arguably could infer from Ms. Miller's testimony that she viewed an adult pornographic video and the photos of naked children in quick succession, and therefore that Ms. Turenne stored the photos of the children near where she stored at least one adult pornographic video in her phone. And, if the jury made those inferences, the jury possibly could have also inferred that the photos of the children provided sexual gratification to Ms. Turenne in the same way that the nearby adult pornographic video presumably provided her with sexual gratification. In addition, Ms. Turenne told the investigators that, when others sent her adult pornographic materials, they would automatically be downloaded to her camera. This arguably also could have supported an inference that the video Ms. Miller saw was located on Ms. Turenne's camera roll – the same part of the phone where Ms. Miller saw the pictures of the children. However, as Ms. Turenne points out, the State did not offer forensic evidence showing that her phone was organized in such a way to demonstrate a relationship between the adult pornography and the photos of the children.

We need not decide whether the evidence of Ms. Turenne's possession of adult pornography provides additional support for her child sexual abuse convictions.[16] The context that we have discussed above – how, where, and when Ms. Turenne took the photos and her statements concerning the photos – combined with the content of the photos, would

[16] We also need not decide whether the evidence that was introduced concerning Ms. Turenne's sexual orientation supports her convictions in this case. First, our grant of certiorari was expressly limited to the first question presented, which did not raise the issue of Ms. Turenne's sexual orientation. And we declined to grant review with respect to a question concerning the sexual orientation evidence. Second, the evidence is sufficient to sustain Ms. Turenne's child sexual abuse convictions (as well as her child pornography-related convictions, as discussed below) without consideration of such evidence. However, nothing in this opinion should be construed as predetermining the outcome of any post-conviction petition that Ms. Turenne may subsequently file.

A few additional observations about the sexual orientation evidence are also in order. We agree with the Appellate Court that the prosecutor was not arguing that Ms. Turenne was probably a child abuser because she was gay. *See Turenne*, 258 Md. App. at 263-64. However, both counsel seemed to be of the view that Ms. Turenne's sexual orientation could shed light on whether the photos of the children were sexual in nature and whether Ms. Turenne took them for sexual gratification. Thus, the prosecutor elicited from Ms. Miller that Ms. Turenne told her she was gay and argued to the jury: "She told [Ms. Miller] that she was gay or bisexual, which, obviously doesn't matter, but it matters when you're looking at whether she had any sexual gratification for taking these pictures, holding on to these pictures for as long as she did." For his part, defense counsel elicited from Detective Rockwell that there was both male and female adult pornography on Ms. Turenne's phone, and argued to the jury: "There's pictures of male genitalia, too, of adult male genitalia. [The State doesn't] mention that. They're making the argument that she's gay, but she has male genitalia in these pictures."

Without data to support a correlation of this sort, litigants should avoid eliciting such evidence and making such arguments, regardless of the defendant's particular sexual orientation and regardless of the genders of the defendant and victim. However, where the defendant is gay or lesbian and is of the same gender as the alleged victim, an attempt to make such a connection is particularly concerning, because it "could be misinterpreted" as "reinforc[ing] a terrible stereotype of gay and lesbian people" and "perpetrating a pernicious falsehood about same-sex orientation." *Turenne*, 258 Md. App. at 264.

29

allow a rational juror to conclude that the photos were sexually exploitative. Thus, we affirm Ms. Turenne's convictions for child sexual abuse under CR § 3-602(b)(1).

## B. The Child Pornography Counts

We turn now to the sufficiency of the evidence in support of Counts 9-16 and 17-24, which charged Ms. Turenne with production of child pornography and possession of child pornography, respectively. The validity of these convictions turns on whether the State proved that the photos depicted "lascivious exhibitions" of the children's genitals or pubic areas.

### 1. Production of Child Pornography

Under CR § 11-207(a)(1), a person may not "cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of obscene matter or a visual representation or performance that depicts a minor engaged as a subject in … sexual conduct[.]" As relevant here, "sexual conduct" is defined as the "lascivious exhibition of the genitals or pubic area of any person." *Id.* § 11-101(d)(4). The Criminal Law Article does not define the phrase "lascivious exhibition," as used in § 11-104(d)(4).

Ms. Turenne urges us to adopt an objective test to determine whether an image depicts a lascivious exhibition of a child's genitals, relying on *United States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022). Ms. Turenne contends that, in adding "lascivious exhibition" of the genitals or pubic area to the definition of "sexual conduct," the General Assembly intended to criminalize only those exhibitions that are objectively sexual and connote sexual activity or sexual desire. According to Ms. Turenne, a factfinder should be limited to analyzing the "four corners" of an image in determining whether the image meets that

standard. However, Ms. Turenne also asserts that even under other standards adopted by courts interpreting the phrase "lascivious exhibition," the evidence was insufficient to convict her of production of child pornography.

The State argues that the evidence was sufficient to convict Ms. Turenne of production of child pornography, regardless of whether this Court applies *Hillie*, the *Dost* factors used by many courts,[17] or the totality-of-the-circumstances approach employed by the Appellate Court of Maryland. The State asks us to adopt a test that permits a factfinder to look beyond the four corners of an image and to consider the defendant's subjective intent as a factor in determining whether an image depicts a lascivious exhibition.

As we explain below, we decline to adopt a test that prohibits the trier of fact from looking beyond the four corners of an image. Instead, similar to our analysis of whether an act is sexually exploitative for purposes of the child sexual abuse statute, we adopt a content-plus-context test that considers both the contents of an image and the totality of circumstances that directly relate to the exhibition of a child's genitals or pubic area. However, unlike the inquiry concerning a child sexual abuse charge, where the content-plus-context test is used to determine whether the defendant subjectively derived sexual gratification or another benefit from the alleged act of abuse, the content-plus-context test that we adopt for purposes of child pornography charges is used to determine whether an image is objectively sexual in nature.

---

[17] We discuss *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), below.

31

### a. The Constitutional Limits on Criminalization of Depictions of Child Nudity

The First Amendment imposes limits on government's ability to regulate pornography. Adult pornography is subject to an obscenity standard. States can regulate depictions of sexual conduct involving adults without violating the First Amendment if the depiction, "taken as a whole, appeal[s] to the prurient interest in sex," "portray[s] sexual conduct in a patently offensive way," and "do[es] not have serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973).

Child pornography is not subject to the same standard. In *New York v. Ferber,* the Supreme Court held that child pornography can be regulated without infringing on the First Amendment, even if the depiction is not obscene. 458 U.S. 747, 756, 764 (1982). The *Ferber* Court identified several reasons for this "greater leeway" to regulate non-obscene content involving minors, including: (1) the compelling state interest in "safeguarding the physical and psychological well-being" of children; (2) the fact that child pornography creates a harmful, permanent record of the child's participation; and (3) the need for states to restrict the distribution of child pornography to effectively restrict its creation. *See id.* at 756-62 (quoting *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 607 (1982)). According to the *Ferber* Court, if the prohibited conduct was "adequately defined by … state law, as written or authoritatively construed," and the category of "sexual conduct" was "suitably limited and described," a statute regulating child pornography would be neither underinclusive nor overinclusive and would not violate the First Amendment. *Id.* at 764-65, 766-73.

Images that depict the genitalia of nude children are not per se lascivious exhibitions. That is the case based on the language of CR § 11-101(d)(4). *See, e.g.*, *United States v. Villard*, 885 F.2d 117, 121 (3d Cir. 1989) ("The language of the statute makes clear that the depictions must consist of more than merely nudity; otherwise, inclusion of the term 'lascivious' would be meaningless.") (analyzing the similarly worded federal statute). It is also the case because criminalizing all depictions of child nudity – including innocent pictures of children playing in a bathtub in their home and other nonsexual depictions of nude children – would be unconstitutionally overbroad, in violation of the First Amendment. *See Osborne v. Ohio*, 495 U.S. 103, 113-14 (1990) (Ohio Supreme Court's limiting construction of statute as prohibiting "the possession or viewing of material or performance of a minor who is in a state of nudity, where such nudity constitutes a lewd exhibition or involves a graphic focus on the genitals" rendered the statute permissible under the First Amendment because it "avoided penalizing persons for viewing or possessing innocuous photographs of naked children"); *Commonwealth v. Davidson*, 938 A.2d 198, 214-15 (Pa. 2007) (Pennsylvania statute criminalizing depictions of minors engaged in nudity for the purpose of sexual stimulation or gratification not unconstitutionally overbroad; "[t]he qualifier to the term 'nudity' narrows and limits the reach of the statute. In doing so, the General Assembly made clear that it did not seek to punish individuals for viewing or possessing innocent materials containing naked minors … *e.g.*, a photograph of a baby's bath."); *State v. Whited*, 506 S.W.3d 416, 431 (Tenn. 2016) ("[C]riminalizing conduct that involves a depiction of 'mere nudity' may have constitutional implications.").

### b. Courts' Differing Approaches Regarding "Lascivious Exhibition"

Federal law and many states' laws prohibit the production of images that depict the "lascivious exhibition" of children's genitals, pubic areas, and other private parts. However, federal courts, as well as state courts, have varied in their approaches to determining whether an image constitutes a lascivious exhibition. We summarize four existing approaches: the *Dost* factors, the totality-of-the-circumstances test, the "limited context" modification of the *Dost* factors, and the *Hillie* standard.

### i. The *Dost* Factors

The closest thing to a majority approach comes from a federal district court opinion issued almost 40 years ago. *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), *aff'd sub nom. United States v. Wiegand*, 812 F.2d 1239 (9th Cir. 1987). The court in *Dost* articulated a list of six factors to use in determining whether an image is a "lascivious exhibition" of the genitals:[18]

> 1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

---

[18] *Dost* analyzed the predecessor statute to 18 U.S.C. § 2256, which defines "sexually explicit conduct" as including actual or simulated "lascivious exhibition of the anus, genitals, or pubic area of any person[.]" 18 U.S.C. § 2256(2)(A)(v). As we describe below, Maryland's definition of "sexual conduct" was amended in 2019 to add "lascivious exhibition" language that resembles the language of this federal statute. Thus, *Dost, Hillie,* and other cases that interpret the federal "lascivious exhibition" language are useful comparisons. *See Harris v. State*, 331 Md. 137, 156-57 (1993) ("The interpretation given a federal statute ordinarily is persuasive in interpreting a state statute patterned upon the federal statute."); *see also State v. Whited*, 506 S.W.3d 416, 426 (Tenn. 2016) (explaining that "[f]ederal decisions on the question of lasciviousness are useful for comparison because federal law is similar to Tennessee law in the area of child sexual exploitation").

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 832. The *Dost* Court further stated that: (1) all six factors need not be present for an image to be lascivious; (2) in addition to the listed factors, the trier of fact should consider any other factors that may be relevant in a particular case; and (3) the determination of lasciviousness must be made "based on the overall content of the visual depiction, taking into account the age of the minor." *Id.*

At least seven of the federal appellate circuits have adopted or approved of the *Dost* factors to varying degrees. *See, e.g., United States v. Amirault*, 173 F.3d 28 (1st Cir. 1999); *United States v. Spoor*, 904 F.3d 141 (2d Cir. 2018); *United States v. Villard*, 885 F.2d 117 (3d Cir. 1989); *United States v. McCall*, 833 F.3d 560 (5th Cir. 2016); *United States v. Brown*, 579 F.3d 672 (6th Cir. 2009)[19]; *United States v. Lohse*, 797 F.3d 515 (8th Cir. 2015); *United States v. Boam*, 69 F.4th 601 (9th Cir. 2023). Some courts have opined that the *Dost* factors "are neither comprehensive nor necessarily applicable in every situation." *Amirault*, 173 F.3d at 32. Other courts use the *Dost* factors as a "starting point." *Boam*, 69

---

[19] As discussed below, *Brown* can be viewed as articulating a test that is distinct from other courts' understandings of the *Dost* factors.

F.4th at 608; *see also United States v. Perkins*, 850 F.3d 1109, 1121 (9th Cir. 2017) (opining that the *Dost* factors "are neither exclusive nor conclusive," and courts may consider "any other factor that may be relevant in a particular case") (internal quotation marks and citation omitted).

In addition to the variation that exists in courts applying the *Dost* factors, there has also been criticism of the factors, even among the circuits that have adopted or applied them. *See, e.g., United States v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) ("There are many reasons for the need for caution about the use of the *Dost* factors[.]"). In particular, the fifth factor – "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity" – has been repeatedly criticized. Courts have noted that "[c]hildren do not characteristically have countenances inviting sexual activity," *id.* at 89, and recognized that "[c]hildren posing for pornographic pictures may suffer dramatic harm regardless of whether they have an 'adult' look of sexual invitation or coyness on their face." *United States v. Knox*, 32 F.3d 733, 747 (3d Cir. 1994). This factor's emphasis on the conduct of the child victim means that its application can be "over-generous to the defendant," *Wiegand*, 812 F.2d at 1244, and courts applying the *Dost* factors have sometimes declined to consider it. *See, e.g., United States v. Johnson*, 639 F.3d 433, 440 (8th Cir. 2011) ("The fact that the young women in the videos were not acting in an obviously sexual manner, suggesting coyness or a willingness to engage in sexual activity, does not necessarily indicate that the videos themselves were not or were not intended to be lascivious."); *United States v. Wolf*, 890 F.2d 241, 246 (10th Cir. 1989) (requiring a child "to exhibit lust, wantonness, sexual coyness or other inappropriate precocity" "would pervert both the

language and the logic of the [child pornography] legislation and the case law"); *United States v. Horn*, 187 F.3d 781, 790 (8th Cir. 1999) ("The lascivious exhibition is not the work of the child, whose innocence is not in question, but of the producer or editor of the video.") (cleaned up).

In addition, the sixth *Dost* factor – "whether the visual depiction is intended or designed to elicit a sexual response in the viewer" – has confounded many courts. As the First Circuit commented:

> Is this a subjective or objective standard, and should we be evaluating the response of an average viewer or the specific defendant in this case? Moreover, is the intent to elicit a sexual response analyzed from the perspective of the photograph's composition, or from extrinsic evidence (such as where the photograph was obtained, who the photographer was, etc.)?

*Amirault*, 173 F.3d at 34. Some courts view this factor subjectively and find the sixth factor satisfied when the image appeals to the defendant's sexual desires, while others view the factor as informing an objective inquiry. *Compare Wiegand*, 812 F.2d at 1244 ("It was a lascivious exhibition because the photographer arrayed it to suit his peculiar lust."), *with Spoor*, 904 F.3d at 150 (clarifying that the sixth *Dost* factor "should be considered by the jury in a child pornography production case only to the extent that it is relevant to the jury's analysis of the five other factors and the objective elements of the image").

### ii. The Totality-of-the-Circumstances Test

A second approach is the one articulated by the Appellate Court in deciding this case: a totality-of-the-circumstances test. *Turenne*, 258 Md. App. at 246-47. Arguably, this approach is consistent with what the *Dost* Court had in mind when it said that, "in

determining whether a visual depiction of a minor constitutes a 'lascivious exhibition of the genitals or pubic area[,] . . .' the trier of fact should look to the [six enumerated] factors, *among any others that may be relevant* in the particular case[.]" *Dost*, 636 F. Supp. at 832 (emphasis added).

However, reading *Dost* and some subsequent cases to suggest that some or all of the *Dost* factors must be considered in every case, the Appellate Court and several other courts have explicitly rejected the *Dost* factors as a test and instead have "rel[ied] on the plain meaning of 'lascivious exhibition' and appl[ied] a totality of the circumstances approach." *Turenne*, 258 Md. App. at 247. The Appellate Court opined that this approach "is most appropriate given the varied and nuanced contexts of child pornography." *Id.* After framing the question of whether a visual representation "depicts the minor's genitals or pubic area in order to excite lustfulness or sexual stimulation in the viewer," *id.* (cleaned up), the Appellate Court stated: "Answering this question requires consideration of all circumstances surrounding a depiction; not just the image itself, but the actions and preferences of the defendant." *Id.*

### iii.  The Sixth Circuit's "Limited Context" Approach

In *United States v. Brown*, 579 F.3d 672 (6th Cir. 2009), the Sixth Circuit took a narrower approach than the *Dost* Court and the Appellate Court in determining whether a photograph constitutes a lascivious exhibition. Construing the sixth *Dost* factor, the Sixth Circuit opted for a "limited context" test, which allows a factfinder to consider

"circumstances directly related to the taking of the images" along with the content of the images. *Id.* at 683.

The *Brown* Court undertook its analysis because only one of the images that bore on a contested federal Sentencing Guidelines issue was lascivious based on the four corners of the image. *Id.* at 681. The question thus became whether the sentencing court "could have properly looked beyond the four corners of the [other] photographs." *Id.* at 682. Recognizing that the Sixth Circuit had previously applied the *Dost* factors in assessing lasciviousness, *see id.* at 680, the court determined that the answer to the question before it depended on the proper interpretation of the sixth *Dost* factor. *See id.* at 682.

The court noted the disagreement among other courts about the meaning of the sixth factor's phrase "intended to elicit a sexual response in the viewer," *id.* at 682-83, and said that "[t]he lack of consensus among our sister circuits is understandable, given that there are important considerations weighing in favor of both" a subjective and an objective approach. *Id.* at 683. On the one hand, the court observed that "[t]he use of the word 'intended' seems to establish that the subjective intent of the photographer is relevant." *Id.* at 682. On the other hand, the court explained that because "the word 'intended' is found in the *Dost* court's test, and not in a criminal statute," it is appropriate "to determine if the element of intent *should* be examined in determining whether the image is lascivious." *Id.*

The *Brown* Court rejected the idea that "lasciviousness should be determined from the image alone." *Id.* Rather, the court emphasized the need to consider an image's context: "Ignoring the contextual evidence construes the statute too narrowly as it inevitably fails to capture behavior that is 'intended' to exploit children." *Id.* at 683.

39

However, the court also saw peril in placing "too much emphasis on the subjective intent of the photographer or viewer[.]" *Id.* In doing so, "a seemingly innocuous photograph might be considered lascivious based solely upon the subjective reaction of the person who is taking or viewing it." *Id.* This, in turn, "could invoke the constitutional concerns associated with criminalizing protected expressive activity." *Id.* In addition, the court reasoned, "a rule that considers too much prejudicial context – *e.g*., facts such as the past behavior of the defendant, other alleged deviancies of the defendant, and criminal conduct that is not directly related to the charge at hand – could pose due process concerns and could be used to convict defendants for acts other than those for which he or she is prosecuted." *Id.*

These considerations led the Sixth Circuit to conclude that the best way to apply the sixth *Dost* factor is to take a sort of hybrid approach that neither ignores the context surrounding the four corners of an image, nor considers a particular defendant's subjective preferences in the abstract, as divorced from how those preferences are manifested in the image:

> In sum, while the context in which an image was taken likely helps a factfinder understand whether an image was intended to elicit a sexual response in the viewer, there is a countervailing and significant risk that a context-specific test could reach too broadly and "over-criminalize" behavior. In light of these competing concerns, we find that it is appropriate to apply a "limited context" test that permits consideration of the context in which the images were taken, but limits the consideration of contextual evidence to the circumstances directly related to the taking of the images.

*Id.* Under the *Brown* Court's limited context test, a factfinder can consider "evidence about (1) where, when, and under what circumstances the photographs were taken, (2) the

presence of other images of the same victim(s) taken at or around the same time, and

(3) any statements a defendant made about the images." *Id.* at 683-84 (footnote omitted).

However, "past bad acts of the defendant, the defendant's possession of other pornography

(pornography of another type or of other victims), and other generalized facts that would

relate only to the general 'unseemliness' of the defendant" are off-limits and cannot be

considered. *Id.* at 684.

### iv.   The *Hillie* Standard

A fourth approach, and the one advocated by Ms. Turenne, comes from *United

States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022). *Hillie* held that "'lascivious exhibition of

the anus, genitals, or pubic area of any person' . . . mean[s] that the minor displayed his or

her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or

thing appearing with the minor in the image, exhibits sexual desire or an inclination to

engage in *any* type of sexual activity." *Id.* at 685. The *Hillie* Court reasoned that this

interpretation of the federal statute was required under *New York v. Ferber*, which in turn

referenced the Supreme Court's earlier cases that purportedly equated "sexual conduct"

with "hard core" sexual activity, even in the context of "lewd exhibition" of the genitals.

*Id.* at 681-85. The *Hillie* Court also relied on the canon of *noscitur a sociis*, "which counsels

that a word is given more precise content by the neighboring words with which it is

associated," to determine that the lascivious exhibition "must be performed in a manner

that connotes the commission of a sexual act." *Id.* at 685 (internal quotation marks and

citation omitted). The court reasoned that because all the other acts that qualified as

41

"sexually explicit conduct" under the federal statute were specific sexual acts, "lascivious exhibition" should likewise be construed in a way that connotes a sexual act. *Id.*

### c. *Our Interpretation of "Lascivious Exhibition"*

Maryland's child pornography statutes do not define what a "lascivious" exhibition is. When a term is not defined, we must determine what the term means, applying Maryland's well-established rules for statutory interpretation. The "cardinal rule of statutory interpretation" is to "ascertain and effectuate the General Assembly's purpose and intent when it enacted the statute." *Wheeling v. Selene Fin. LP*, 473 Md. 356, 376 (2021). We do so by first examining the "normal, plain meaning" of the statute's language. *Id.* Where, as here, a term is not defined by the statute, "we may refer to the dictionary and give the words their ordinary meaning." *State v. Wilson*, 471 Md. 136, 160 (2020). We "read the statute as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Johnson v. State*, 467 Md. 362, 372 (2020) (internal quotation marks and citations omitted).

"Where statutory language is ambiguous and thus subject to more than one reasonable interpretation, or where the language is unambiguous when read in isolation, but ambiguous when considered in the context of a larger statutory scheme, a court must resolve the ambiguity by searching for legislative intent in other indicia, including the history of the legislation or other relevant sources intrinsic and extrinsic to the legislative process." *Buarque de Macedo v. Automobile Ins. Co. of Hartford, Conn.*, 480 Md. 200, 216 (2022) (internal quotation marks and citation omitted). In addition, we "check our

interpretation against the consequences of alternative readings of the text," *Bell v. Chance*, 460 Md. 28, 53 (2018), which "grounds the analysis." *In re O.P.*, 470 Md. 225, 255 (2020).

> i. *An Image Need Not Connote or Show Desire or Sexual Activity to Be a Lascivious Exhibition.*

As discussed above, because the phrase "exhibition of the genitals or pubic area" is qualified by the word "lascivious," more than mere nudity is required. *See Villard*, 885 F.2d at 124; *United States v. Courtade*, 929 F.3d 186, 191 (4th Cir. 2019) ("[T]hat Jane Doe appears nude in the video cannot suffice to prove that the video meets the statutory definition [of lascivious exhibition]. If that were so, the word lascivious would become superfluous."). "Lascivious" is defined as "tending to excite lust; lewd; indecent; obscene." *Lascivious*, Black's Law Dictionary (11th ed. 2019). Thus, nudity is lascivious if it is depicted in a sexual, indecent, or lewd manner or otherwise tends to arouse sexual desire. *See, e.g., Knox*, 32 F.3d at 750 ("Nudity must be coupled with other circumstances that make the visual depiction lascivious or sexually provocative in order to fall within the parameters of the statute.").

Like the *Hillie* Court, Ms. Turenne relies on the associated-words canon to assert that the meaning of "lascivious exhibition" is informed by the other terms listed in the definition of "sexual conduct."[20] Ms. Turenne contends that because these other terms are

---

[20] Subtitle 11 of the Criminal Law Article defines "sexual conduct" as:

   (1)  human masturbation;

   (2)  sexual intercourse;

affirmative sexual acts, a display of genitals or pubic area must also "connote or show desire or sexual activity" to be a lascivious exhibition.

We disagree. As the Seventh Circuit said in rejecting the same argument: "We … do not believe that the associated-words canon can be invoked here to limit this term…. The term 'lascivious exhibition' has its own meaning that is plainly related to, but distinct from, the other terms in [18 U.S.C.] § 2256(2)(A)." *United States v. Donoho*, 76 F.4th 588, 600 (7th Cir. 2023). That meaning is not limited to sexual acts or displays of sexual desire. While a lascivious exhibition must be sexual *in nature*, it need not connote or show sexual desire or sexual activity. Put another way, the exhibition must depict more than innocent nudity, but it need not show the child or anyone else doing anything sexual. The producer of an image may create a lascivious exhibition by depicting a child as a sexual object without forcing the child to engage in a sexual act or causing the child to reflect or simulate sexual desire. *See Spoor*, 904 F.3d at 149 (reasonable juror could find that video of nude boy's genitalia, filmed while boy was "in bed and without any other context," was

---

(3) whether alone or with another individual or animal, any touching of or contact with:

    (i)  the genitals, buttocks, or pubic areas of an individual; or

    (ii)  breasts of a female individual; or

(4)  lascivious exhibition of the genitals or pubic area of any person.

CR § 11-101(d).

lascivious because it served "no obvious purpose other than to present the child as a sexual object").[21]

Our interpretation of the statutory language is consistent with the General Assembly's purpose in adding "lascivious exhibition" to the definition of "sexual conduct" in 2019. *See* 2019 Md. Laws, ch. 325 (House Bill 1027), ch. 326 (Senate Bill 736). The purpose of this amendment was to "update the standard for 'sexual conduct' so that it was consistent with the federal standard and to close a loophole that prevented the prosecution of certain individuals in Maryland." *In re S.K.*, 466 Md. 31, 56 n.22 (2019); *see also* Letter from Del. Lesley J. Lopez in Support of H.B. 1027 ("Lopez Letter") ("HB 1027 will strengthen our current child porn laws by elevating them to that of the federal standard."). Testimony from advocates supporting the amendment indicates that it was intended to allow the prosecution of "child pornographers who produce or possess images that are undeniably sexually explicit, but do not show active touching." Maryland Coalition Against Sexual Assault, Testimony Supporting H.B. 1027 with Amendment; *see also* Lopez Letter ("Specifically, we seek to include the phrase 'lascivious exhibition' to the definition of what constitutes sexual conduct. Lascivious exhibition essentially involves a sexual act or exhibition that does not involve actual physical or sexual contact with the victim."). This legislative history demonstrates that the purpose of the amendment was to expand the categories of conduct that could be punished under Maryland's child

---

[21] We also agree with the *Donoho* Court that *Hillie* misinterpreted *Ferber*'s reference to "lewd exhibition" being directed at the "hard core" of child pornography. *See Donoho*, 76 F.4th at 599-600.

pornography statutes. *Hillie*'s interpretation of "lascivious exhibition" is inconsistent with the General Assembly's goal of increasing protection for children who are the subjects of sexually explicit images that do not show active touching.

Adoption of the *Hillie* standard would also lead to an absurd interpretation of CR § 11-101(d)(4) and by extension CR § 11-207(a)(1), by making it virtually impossible to prosecute someone for producing an image of a young child's genitals or pubic area that does not depict someone performing a sex act. As discussed above, the fifth *Dost* factor – "whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity" – has been repeatedly criticized and often found not to be relevant to the determination of lasciviousness when the victim is a young child. *See, e.g.*, *Frabizio*, 459 F.3d at 89; *Knox*, 32 F.3d at 747; *Wiegand*, 812 F.2d at 1244; *Johnson*, 639 F.3d at 440; *Wolf*, 890 F.2d at 246; *Horn*, 187 F.3d at 790. If we adopted *Hillie*'s reasoning, we essentially would be requiring the State to prove the existence of the fifth *Dost* factor in every case where a lascivious exhibition is alleged but no sexual activity is shown – even in cases involving children too young to be coaxed into simulating sexual coyness or a willingness to engage in sexual activity. That would run the risk of allowing pedophiles to avoid criminal liability by creating images depicting the genitals or pubic areas of children without showing their faces. We are confident that such absurd results were not what the General Assembly had in mind when it added the "lascivious exhibition" language to the definition of "sexual conduct." *See State v. Bolles*, 541 S.W.3d 128, 139 (Tx. Crim. App. 2017) ("[T]o suggest that a child has to be doing something sexual in order for the image to be considered lewd would effectively exclude from the definition of child pornography

46

all images of children who are too young to understand what 'sexual' even means. To interpret the statute as requiring some form of mens rea on the part of the child would be an absurd result the legislature could not have intended.").

### ii. We Adopt a Content-Plus-Context Test for Determining Whether an Image Constitutes a Lascivious Exhibition.

Our rejection of the *Hillie* standard does not resolve the question of what test should be used in determining whether an image depicts a lascivious exhibition. After considering the various formulations that other courts have used in assessing whether an image is lascivious, we choose to adopt a content-plus-context standard that is similar to the Sixth Circuit's "limited context" formulation in *Brown*. Under this content-plus-context standard, whether an image depicts a "lascivious exhibition of the genitals or pubic area" is determined by: (1) the contents of the image; and (2) the totality of the circumstances that directly relate to the exhibition of the genitals or pubic area. After reviewing the content and context of an image that is alleged to be a lascivious exhibition, the jury must determine whether the image is objectively sexual in nature.[22]

Our test is designed to avoid being both underinclusive and overinclusive. An approach that considers only the content within the four corners of an image and ignores the context of the exhibition is underinclusive, in that it is more likely to fail to capture behavior that is intended to exploit children. This concern is heightened "in a context where young children are at risk." *Brown*, 579 F.3d at 683. In cases involving young children, a

---

[22] Because this case involves photographs, we have found it expedient to refer to "photographs," "photos," and "images" throughout this opinion. To be clear, the test we adopt today applies to all types of visual representations.

trier of fact who considers only the four corners of an image may not get the message that the creator of the image is trying to send. When the exhibition is less overtly sexual within the four corners of the image, and the subject of the image is a young child who is incapable of feigning or expressing sexual coyness or desire, an ordinary person who cannot consider circumstances related to the image is more likely to find the image not lascivious, even where many pedophiles would likely consider it lascivious. When the context surrounding the exhibition is considered, a trier of fact who is not a pedophile is more likely to understand the image as its creator meant it to be understood.

At the same time, our approach avoids being overinclusive by reducing the risk that an innocent depiction will be deemed child pornography. Allowing a factfinder to consider contextual evidence related to the exhibition permits defendants to introduce evidence outside the four corners of the image that tends to show the picture is not sexual in nature. *See Brown*, 579 F.3d at 683. This goes a long way toward ensuring that legitimate expressive activity is not criminalized merely because it contains an image of a child's nude genitals or pubic area. *See id.*

A recent Fourth Circuit case helps illustrate the limitations of a content-only approach. In *United States v. Courtade*, the Fourth Circuit affirmed the child pornography conviction of a defendant who pled guilty to creating a video of his teenage stepdaughter in the shower. 929 F.3d 186 (4th Cir. 2019). The court declined to "venture into the thicket surrounding the *Dost* factors or define the parameters of any subjective-intent inquiry," because it was able to decide the question of lasciviousness "based on the objective characteristics of the video alone." *Id.* at 192. The video depicted the victim undressing,

48

getting in the shower, showering, drying off, and getting dressed, and her breasts and genitals were visible throughout the video. *Id.* The video also recorded the defendant lying to the victim that the camera was turned off, bribing the victim with ice cream in exchange for "testing" whether the camera was waterproof, and instructing the victim how to hold the camera so that her breasts and genitals would be visible. *Id.* at 192-93.

The Fourth Circuit concluded that the video was a "lascivious exhibition" because its contents (both the images and the audio) "make clear that the video's purpose was to excite lust or arouse sexual desire in the viewer." *Id.* at 193. The court explained that "[t]his conclusion requires no probing of [the defendant's] subjective intent or any sustained examination of his motives; it follows from the video itself, and would thus be apparent to any reasonable viewer." *Id.*

We have no quarrel with the way the *Courtade* Court analyzed the video at issue in that case. However, there will be instances where the contents of an image alone will not "make clear that [its] purpose [is] to excite lust or arouse sexual desire in the viewer," *id.*, but where the addition of contextual evidence directly relating to the exhibition will do so. The depiction in *Courtade* "reveal[ed] a young girl deceived and manipulated by an adult man into filming herself nude in the shower." *Id.* That deception and manipulation was obvious from the four corners of the video because the audio revealed what the defendant said to the victim. If the video had been silent, it might have been a closer call whether the depiction was a lascivious exhibition, based solely on its contents. Under a four-corners approach involving such a hypothetical video, the victim's testimony about what the defendant told her to do in the shower would not be relevant to the question of

49

lasciviousness. A difference in outcome depending on the format of the depiction – video with sound, silent video, or still images – surely cannot be what the General Assembly intended when it added the "lascivious exhibition" language to the definition of "sexual conduct."

Another hypothetical helps bring into focus what type of contextual evidence is appropriate to admit concerning the question of whether an image is a lascivious exhibition. Suppose a search of a man's computer for evidence of an unrelated crime reveals an image of the man's 12-year-old son that shows the boy clothed from the waist up but naked from the waist down. He is sitting on a bed, his face turned away from the camera, but his body positioned to fully display his pubic area, which appears to be bruised. A forensic analysis of the computer shows that the image of the son has been stored next to multiple images of adult pornography. The man is charged with sexual abuse of a minor, as well as production and possession of child pornography.

At trial, the defendant testifies that he took the photo to document an injury that his son had suffered earlier that day at school when he was kicked in the groin in a fight. Under our content-plus-context approach, that evidence would provide permissible context to help the trier of fact understand whether the photo was sexual in nature.

However, it would not be appropriate for the State to admit evidence that the defendant stored the photo near adult pornography as substantive evidence of the photo's

lasciviousness. An image is either lascivious or not lascivious at the moment it is created. Where a person chooses to store an image does not change the nature of the exhibition.[23]

Where a defendant is charged with both sexual abuse of a minor and production of child pornography based on the creation of an image that depicts a minor's genitals or pubic area, a particular piece of contextual evidence may be relevant to prove both that the defendant obtained sexual gratification for purposes of the sexual abuse charge and that the photo is sexual in nature for purposes of the child pornography charge. However, it is possible that some contextual evidence may be relevant only to the child sexual abuse charge and not to the child pornography charge. With respect to the former, any contextual evidence that is relevant to prove the defendant's subjective sexual gratification (or other benefit) is fair game, subject to objections under Maryland Rule 5-403. As for the latter, contextual evidence must be directly related to the exhibition. That is, it must tend to shed light on the meaning of the exhibition – *i.e.*, whether the exhibition is sexual in nature – when viewed objectively. Put another way, contextual evidence must be probative of whether or not "the [image]'s purpose was to excite lust or arouse sexual desire in the viewer," *Courtade*, 929 F.3d at 193, viewed objectively.

To prove that an image is lascivious, the State must do more than simply show that its creator subjectively found it to be sexual in nature. The State must show that the image is objectively sexual in nature. The defendant's subjective motivations may be apparent in

---

[23] We do not rule out the possibility that evidence of storage of alleged child pornography near adult pornography may be admissible with respect to a child pornography charge for a different purpose, such as impeachment. *See also* note 24 below.

contextual evidence that sheds light on the objective nature of the image. But evidence that only shows the defendant's subjective reaction to an exhibition and does not directly relate to the exhibition itself is not probative of whether the exhibition is objectively sexual in nature.[24]

### d. *The Evidence Was Sufficient to Convict Ms. Turenne of Producing Child Pornography.*

Applying the content-plus-context test to the evidence in this case, viewed in the light most favorable to the State, we conclude that a rational juror could find beyond a reasonable doubt that Ms. Turenne's photos depicted lascivious exhibitions of the

---

[24] Our content-plus-context standard, unlike *Brown*'s limited-context approach, is not a gloss on one or more of the *Dost* factors. We do not adopt the *Dost* factors in whole or in part as the test for determination of lasciviousness in Maryland. That is not to say, however, that *Dost* was off base in identifying factors that are often relevant in determining whether an image depicts a lascivious exhibition. We suspect that, in many cases involving alleged lascivious exhibitions under Maryland's child pornography statutes, the parties will end up making arguments concerning points that are also covered in the *Dost* factors.

In addition, to the extent that the *Brown* Court suggested that a defendant's creation or possession of pornographic images of other children may not be considered in determining whether a particular image of a child is a lascivious exhibition, we disagree. As we discuss below, comparing the images of different children in this case could help inform the factfinder's determination of whether, viewed objectively, the purpose of one or more of the images was to excite lust or to arouse sexual desire in the viewer. In addition, we do not adopt a bright-line prohibition of consideration of pornography of "another type," such as legal, adult pornography. We can imagine circumstances both where evidence of other forms of pornography would be relevant, or in the alternative not relevant to whether a contested image of a child is sexual in nature. Thus, while the mere storing of an image of a child near an adult pornographic image does not bear on whether the child image is lascivious, the particular characteristics of the adult pornography could make the adult image relevant to the analysis. We leave such admissibility determinations to the sound discretion of our trial courts.

52

children's genitals and pubic areas. That is, a rational juror could have concluded that the photos are not examples of "mere nudity" but rather are objectively sexual in nature.

We begin by considering the contents of the photos. When looking at a photograph, the subject of the image is of course relevant. Here, all eight girls were partially or fully nude. All had nude genitals and pubic areas on display.

The way in which the image has been framed or edited is also important for a factfinder to consider. *See, e.g., United States v. Stewart*, 729 F.3d 517, 528 (6th Cir. 2013) (noting that the jury "may consider evidence of composition, framing, and focus to support a finding of lasciviousness"); *Horn*, 187 F.3d at 790 ("By focusing the viewer's attention on the pubic area, freeze-framing can create an image intended to elicit a sexual response in the viewer."). Indeed, images have been found to be child pornography even when the picture has been adapted from a larger, non-lascivious image. *See Bolles*, 541 S.W.3d at 131, 143-44 (photo showing a close-up of a toddler's pubic area was child pornography even though it was a zoomed-in and cropped version of a famous, non-pornographic Robert Mapplethorpe portrait).

Here, Ms. Turenne focused on the children's genitals and pubic areas in all the images. In a few of the photographs, there is very little else displayed besides the child's genitals. None of the children's faces are visible in the photographs. Courts have found a lascivious exhibition of the genitals where the photographer chose to focus on the genitals and omitted other body parts. For example, in *Brown*, the defendant took several photographs of his toddler granddaughters in which their genitals were "prominently visible at the center of the photographs" and their faces were omitted. *Brown*, 579 F.3d at

53

681. The Sixth Circuit viewed this decision not to include the girls' heads as "odd" and as suggesting that "there may have been an inappropriate or lascivious focus." *Id.*; *see also Johnson*, 639 F.3d at 440 (reasonable jury could have determined that video clips showing nude teenage girls from their shoulders to their calves were designed to portray them as "sexual objects").[25]

In addition, as discussed above, a rational juror could conclude that Ms. Turenne put several of the children in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals. This also could contribute to a finding that the photos were sexual in nature.[26]

---

[25] In the dissenting portion of his separate opinion, Chief Justice Fader acknowledges that "the framing of the photographs is a relevant consideration," but asserts that "the framing here still makes clear that the pictures are of children during the process of a diaper change." Dissenting Op. of Fader, C.J., at 17. Viewed in the light most favorable to the State, a rational juror could conclude that these photos were not framed to memorialize an innocent diaper change. Indeed, a diaper is visible only in one image and the only reason the jurors knew the pictures were taken on changing tables was because of the contextual evidence that revealed Ms. Turenne had placed the children on changing tables. Perhaps if the photos had showed the children's faces and their entire bodies on what was obviously a changing table, instead of focusing on their genitals to the exclusion of most everything else, the photos would have been similar in kind to innocent bathtub pictures (or, more to the point, innocent changing table pictures). In any event, even if reasonable minds can differ about whether the focus on the genitals of the children tends to render the photos objectively sexual in nature, our deferential standard of review requires us to resolve any conflict on this point in favor of the State.

[26] Our dissenting colleagues assert that the children shown in the photos "are situated in the midst of diaper changes," "not posed in sexual positions." Dissenting Op. of Fader, C.J., at 17; *see also* Dissenting Op. of Watts, J., at 4 ("The photos show the pubic or external genital area of the children, … with their legs in the position that one would hold a child to change a diaper."). Notably, in recounting the legislative history of the bill that added the "lascivious exhibition" language to the definition of "sexual conduct," Chief Justice Fader quotes testimony of the Maryland Coalition Against Sexual Assault that the amended statute would reach images or videos of "naked toddlers and infants, propped up,

54

Several pieces of contextual evidence also support the jury's finding that the photos are lascivious. One relevant contextual factor is that the photos were all very similar to one another. *See Brown*, 579 F.3d at 684 (photographs showed the two young girls "from a variety of angles, with a general tendency to focus on the girls' genitals," leading the court to observe: "If there were a handful of photographs of a naked child playing in the bathtub, it could be believed that a picture inadvertently focused on a child's genitalia. Here, however, the sheer number of photographs in which the girls' genitals are prominently visible suggests that photographs were taken to elicit a sexual response in the viewer.").[27]

Another contextual factor is that the photos were taken in a daycare center. While it is normal at a daycare center for a toddler's genitals and pubic area to be exposed periodically for diaper changing, a rational juror could find that it is not normal for a toddler to remain naked at a daycare center longer than necessary for a diaper change to be made.

---

bent over in sexual poses in beds or spread eagle on the floor[.]" Dissenting Op. of Fader, C.J., at 12. The jury could have concluded that the photos taken on changing tables showed the visible portion of the children's bodies in a "spread-eagle" position. Reasonable minds again can possibly differ whether the poses of the children in the images objectively convey the message "diaper change in progress" or "sexual object." If we accept that reasonable minds can differ on this point, it follows that the jury was not required to interpret these poses as our dissenting colleagues do.

[27] Chief Justice Fader asserts that the similarities in the framing of seven of the eight images is not relevant to understanding the message contained in any one of the images. *See* Dissenting Op. of Fader, C.J., at 18-19. Respectfully, we disagree. The focus on multiple children's genitals and pubic areas without showing any of their faces tended to make it more likely that each individual image was objectively sexual in nature – as an example of a "no face" child pornographic image, *see, e.g.*, *United States v. Jones*, 748 F.3d 64, 66 (1st Cir. 2014) – rather than a nonsexual image of a diaper rash, as Ms. Turenne claimed.

In addition, Ms. Turenne took several of the photographs in the Center's bathroom, where she was secluded from the rest of the Center's employees and not visible on one of the Center's cameras, and she took all but one of the photographs toward the end of the day. These contextual facts rebutted Ms. Turenne's own contextual testimony that the pictures documented diaper rashes. In addition, Ms. Turenne's repeated statements at the interview that the photographs had "no meaning" – in conjunction with the diaper rash explanation that the jury did not believe – could contribute to a rational juror's finding that the photos indeed had a meaning, and that the meaning was to show the children as sexual objects. *See Brown*, 579 F.3d at 684 (considering statements attributed to the defendant in his Presentence Report and admissions in his plea agreement, which suggested that "the images at issue were intended or designed to elicit a sexual response in the viewer") (internal quotation marks and citation omitted).

In short, based on the content of the photos and the contextual evidence that directly relates to the exhibitions, a rational juror could conclude beyond a reasonable doubt that the eight photos depicted lascivious exhibitions of the minors' genitals and pubic areas. Accordingly, the evidence was sufficient to support Ms. Turenne's convictions on Counts 9-16.

2. Possession of Child Pornography

Finally, we consider Ms. Turenne's convictions for possession of child pornography in Counts 17-24. Under CR § 11-208(b)(2), a person "may not knowingly possess and intentionally retain a … photograph, or other visual representation … showing an actual child … under the age of 16 years … engaged in sexual conduct." As is the case with

56

respect to the statute prohibiting the production of child pornography, "sexual conduct" for purposes of the possession statute includes the "lascivious exhibition of the genitals or pubic area of any person." *Id.* § 11-101(d)(4).

Our analysis above regarding the production statute applies to the possession statute as well. That is, we consider the sufficiency of the evidence supporting Ms. Turenne's convictions on Counts 17-24 using the same content-plus-context test. Just as a rational juror could have concluded that Ms. Turenne created eight visual representations of children engaged in sexual conduct (lascivious exhibitions of their genitals or pubic areas), a rational juror could have concluded that Ms. Turenne possessed and intentionally retained those same photographs.

## IV

## Conclusion

For the reasons stated above, the evidence was sufficient to convict Roseberline Turenne of child sexual abuse, production of child pornography, and possession of child pornography. A rational juror could have found that Ms. Turenne sexually exploited the children in her care by taking photos of their nude genitals and pubic areas for her own sexual gratification.

Whether an image constitutes a "lascivious exhibition" of a child's genitals or pubic area is determined by applying a "content-plus-context" test under which the trier of fact considers: (1) the contents of the image; and (2) the context of the image, *i.e.*, the totality of the circumstances that directly relate to the exhibition of the genitals or pubic area. After reviewing the contents and context of a contested image, the trier of fact must determine

whether the image is objectively sexual in nature. Under that standard, a rational juror could have found that the eight photos at issue depicted lascivious exhibitions of the children's genitals or pubic areas.

Accordingly, we affirm Ms. Turenne's convictions.

**JUDGMENT OF THE APPELLATE COURT OF MARYLAND AFFIRMED. COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Wicomico County
Case No. C-22-CR-21-000263
Argued: April 5, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 20

September Term, 2023

_____

ROSEBERLINE TURENNE

v.

STATE OF MARYLAND
_____

Fader, C.J.,
Watts,
*Hotten,
Booth,
Biran,
Gould,
Eaves,

JJ.

_____

Concurring and Dissenting Opinion
by Fader, C.J., which Booth, J., joins.

_____

Filed: August 16, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I concur in part and dissent in part.

I agree with much in the Majority's thoughtful and well-written opinion, so I will start there. First, I concur in the Majority's resolution regarding the most serious criminal offenses at issue, Ms. Turenne's eight convictions for child sexual abuse under § 3-602(b) of the Criminal Law Article.[1] Specifically, I agree with the Majority that there was sufficient evidence for the jury to infer that Ms. Turenne took the eight pictures at issue for her own benefit. Slip op. at 24-26. I reach that conclusion based on: (1) the focus of the images, which include the genitals and omit the faces of the infant children; (2) the relevant circumstances, including that Ms. Turenne took the photos in violation of the daycare center's policies and generally late in the afternoon when she was alone with the children and no other adults would intrude; and (3) as the Appellate Court aptly put it, "the absence of any credible, innocuous reason for taking and storing such photos[.]"[2] *Turenne v. State*,

---

[1] Ms. Turenne's convictions for child sexual abuse under § 3-602(b) each carry a maximum term of incarceration of 25 years. Md. Code Ann., Crim. Law § 3-602(c) (2021 Repl.). Her convictions for creation and possession of child pornography were each subject to a maximum term of incarceration of ten and five years, respectively, for a first-time offender. *Id.* §§ 11-207(b)(1) (creation of child pornography); 11-208(c)(1) (possession of child pornography).

[2] Although I agree with most of the reasons the Majority identifies in support of its conclusion that "[a] reasonable juror could have determined that Ms. Turenne took photographs of multiple naked children for her own benefit," I disagree with the second reason in the Majority's list, which is that "a reasonable juror could have concluded that Ms. Turenne purposely put several of the children in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals." Slip op. at 24. As discussed further below, the infant children in the pictures taken by Ms. Turenne are situated as infants amid a diaper change, not posed in sexual positions. What appearance might be conveyed by adults posed in the same manner is irrelevant because the pictures are of infants, not adults.

258 Md. App. 224, 250 (2023). I therefore join the Majority's holding affirming Ms. Turenne's convictions for child sexual abuse under § 3-602(b)(1).[3,4]

---

[3] The Majority correctly observes that Ms. Turenne was advised of her post-trial rights and yet failed to file a request for a review of her sentence by a three-judge panel pursuant to Rule 4-344(a), or a motion for modification of her sentence pursuant to Rule 4-345(e). Slip op. at 14 n.10. The crime of child sexual abuse covers a wide range of conduct that "involves sexual molestation or exploitation of a minor," including incest and rape. Crim. Law § 3-602(a)(4). The maximum penalty for child sexual abuse, applicable to the entire range of conduct prohibited by that offense, is 25 years' imprisonment. *Id.* § 3-602(c). For taking and keeping the eight photographs at issue, the court imposed the maximum sentences on all eight counts, to be served consecutively, for a total of 200 years' imprisonment, with 90 years suspended. The resulting 110-year active-time sentence is more time than Ms. Turenne, who was 18 years old at the time of her offenses, could have received had she been found guilty of kidnapping five of the children, *see* Crim. Law § 3-503(b)(1) (establishing maximum sentence for child kidnapping as 20 years' imprisonment); or engaging in sex trafficking of four of the children, *see* Crim. Law § 3-1102(c)(2) (establishing maximum sentence for sex trafficking a minor as 25 years' imprisonment). Without minimizing in any way the severity of the crimes committed by Ms. Turenne or her egregious breach of trust with the families of the children she photographed and with her employer, the record does not suggest any reason why she might have knowingly and intelligently chosen not to pursue her post-trial rights.

[4] The Majority explains that the issue of whether the evidence that was introduced concerning Ms. Turenne's sexual orientation supports her convictions in this case is not before us. Slip op. at 29 n.16. I agree that the issue is not before us because we did not grant certiorari on it, and it was not preserved in the circuit court. Indeed, as the Majority points out, Ms. Turenne's counsel in the circuit court not only did not object to that evidence but also seemed to accept that it could be relevant. *Id.* That made this case a poor one in which to address the issue. And I agree that identifying a connection between adult sexual orientation and any aspect of sexual attraction to children is wrong and could "reinforc[e] a terrible stereotype of gay and lesbian people" and "perpetrat[e] a pernicious falsehood about same-sex orientation." *Id.* (quoting *Turenne*, 258 Md. App. at 264); *see also, e.g.*, Sean Cahill & Sarah Tobias, *Policy Issues Affecting Lesbian, Gay, Bisexual, and Transgender Families* 107 (2006) ("The claim that homosexuals are more likely to molest children has been definitively refuted by peer-reviewed social science research."). And although the question is not before us, I note that courts around the country have rejected the proposition that there might be a link between a pedophile's adult sexual orientation and the pedophile's sexual attraction to children. *See, e.g.*, *Commonwealth v. Christie*, 53

2

Second, with respect to Ms. Turenne's convictions for the creation and possession of child pornography, I largely agree with the Majority's articulation of the standard by which we should judge whether an image or video constitutes a "lascivious exhibition." The Majority does an admirable job of setting forth the sundry approaches that courts in other jurisdictions have taken to assess whether images or videos of children are lascivious. That includes the many courts that have applied some version of the *Dost* factors in a variety of different ways, some entirely objective and some subjective; the totality of the circumstances test applied by the Appellate Court; and the one federal appellate court that has adopted a purely objective approach limited to the four corners of the image or video at issue. Slip op. at 34-42. It is safe to say that there is no single approach to determining

---

N.E.3d 1268, 1274 (Mass. App. Ct. 2016) ("The use of evidence of an adult's homosexuality to demonstrate a sexual interest in underage boys (or, indeed, underage children of either gender) is thus impermissible."); *State v. Blomquist*, 178 P.3d 42, 50 (Kan. Ct. App. 2008) ("It is [not] reasonable to assume that a preference for same gender adult sexual partners establishes a proclivity for sexual gratification with same gender children[.]" (quoting *State v. Ellis*, 820 S.W.2d 699, 702 (Mo. Ct. App. 1991))); *People v. Garcia*, 177 Cal. Rptr. 3d 231, 240 (Ct. App. 2014) ("[A] defendant's sexual attraction to *adults* of the same sex has nothing to do with whether they are sexually attracted to *children* of the same sex."); *Blakeney v. State*, 911 S.W.2d 508, 515 (Tex. App. 1995) (observing that the inference that "homosexual men are also molesters of little boys" is "unsupported by evidence or logic"); *Sias v. State*, 416 So.2d 1213, 1217 (Fla. Dist. Ct. App. 1982) (finding that "there is absolutely no showing that homosexuals as a group are disposed to engage in" "homosexual battery" of minors); Mary E. Becker, *The Abuse Excuse and Patriarchal Narratives*, 92 Nw. U.L. Rev. 1459, 1467 (1998) ("[T]here is no evidence that lesbians are especially likely to abuse girls."). *See generally* Gregory Herek, *Facts About Homosexuality and Child Molestation*, available at http://psychology.ucdavis.edu/rainbow/html/facts_molestation.html (last visited July 16, 2024), *archived at* https://perma.cc/WF3A-JAWD (summarizing studies and concluding that the "mainstream view" is that there is no link between adult sexual orientation and sexual attraction to children).

3

whether images or videos of unclothed children are lascivious that is consistently applied (or applied consistently) by a majority of jurisdictions.

With some differences that I will explain, I ultimately agree with the Majority that it is most appropriate to apply a "content-plus-context" test that considers both the contents of an image and context that bears directly on "whether an image is objectively sexual in nature." *Id.* at 31. As I will also explain, I part ways with the Majority in the application of that test to the images at issue. But I begin, as all exercises in statutory interpretation must, with the language of the statute. *See, e.g.*, *Comptroller v. FC-GEN Operations Invs. LLC*, 482 Md. 343, 379 (2022) ("Our goal is to ascertain and effectuate the intention of the legislature and we begin that exercise by reviewing the statutory language itself." (quoting *Comptroller v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 165 (2005))).

**STATUTORY INTERPRETATION PRINCIPLES**

"The goal of statutory construction is to discern and carry out the intent of the Legislature." *Westminster Mgmt., LLC v. Smith*, 486 Md. 616, 644 (2024) (quoting *Blue v. Prince George's County*, 434 Md. 681, 689 (2013)). We begin our search with the text of the provision at issue, viewed "within the context of the statutory scheme to which it belongs." *Id.* (quoting *Nationstar Mortg. LLC v. Kemp*, 476 Md. 149, 169 (2021)). "Our review of the text is wholistic, seeking to give effect to all of what the General Assembly included and not to add anything that the General Assembly omitted." *Westminster Mgmt.*, 486 Md. at 644. We take the language of the statute as we find it, without adding to or deleting from it and without superimposing forced or subtle interpretations onto it. *Id.*

4

"When statutory terms are undefined, we often look to dictionary definitions as a starting point, to identify the 'ordinary and popular meaning' of the terms," *id.* (quoting *FC-GEN Operations Invs. LLC*, 482 Md. at 390), before "broadening our analysis to consider the other language of the provisions in which the terms appear and the statutory scheme as a whole, including any legislative purpose that is discernible from the statutory text," *Westminster Mgmt.*, 486 Md. at 644.

## THE STATUTES UNDER REVIEW

Ms. Turenne was convicted of eight counts of violating § 11-207(a)(1) of the Criminal Law Article. That statute, as relevant here, provides that "[a] person may not . . . cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of . . . a visual representation or performance that depicts a minor engaged as a subject in . . . sexual conduct." Section 11-207(a)(1) also prohibits "allow[ing] a minor to engage as a subject in the production of obscene matter" and the creation of depictions of minors "engaged as a subject in sadomasochistic abuse[.]" Other provisions of § 11-207 generally prohibit other types of conduct related to the creation or distribution of materials depicting minors engaged as subjects in obscene acts, sadomasochistic abuse, and sexual conduct. *See* Crim. Law § 11-207(a)(2), (3), (4), (5).

Ms. Turenne was also convicted of eight counts of violating § 11-208(b)(2) of the Criminal Law Article. That statute, as relevant here, provides that "[a] person may not knowingly possess and intentionally retain a film, videotape, photograph, or other visual representation showing an actual child . . . under the age of 16 years . . . engaged in sexual

5

conduct[.]"[5]  Section 11-208(b) also prohibits the possession of depictions of a child under the age of 16 "engaged as a subject of sadomasochistic abuse" or "in a state of sexual excitement."[6]

The focus of both § 11-207(a)(1) and § 11-208(b)(2), as well as the other prohibitions contained in §§ 11-207 and 11-208, is solely on the content of the depictions at issue, not the subjective motivations, perception, purpose, or desires of the individuals creating, distributing, or possessing them.[7]

The State contends that the photographs on Ms. Turenne's phone violated both § 11-207(a)(1) and § 11-208(b)(2) because they depict children engaged in "sexual conduct."  That term, in turn, is defined in § 11-101(d) of the Criminal Law Article to encompass:

> (1) human masturbation;
>
> (2) sexual intercourse;
>
> (3) whether alone or with another individual or animal, any touching of or contact with:

---

[5]  Section 11-208(b)(2) was renumbered without any change to the text as § 11-208(b)(1)(ii) when the statute was amended in 2023.  2023 Md. Laws, ch. 759.  Like the Majority, I refer to the section under which Ms. Turenne was charged with possession of child pornography as § 11-208(b)(2).

[6] Section 11-208(d) provides a limited safe harbor:  "[n]othing in this section may be construed to prohibit a parent from possessing visual representations of the parent's own child in the nude" unless the representations depict the child as a subject of sadomasochistic abuse or both engaged in sexual conduct and in a "state of sexual excitement."

[7] As discussed below, that is in contrast to child pornography laws adopted by several other states.

(i) the genitals, buttocks, or pubic areas of an individual; or

(ii) breasts of a female individual; or

(4) lascivious exhibition of the genitals or pubic area of any person.

All parties agree that the photographs at issue do not depict any of the conduct identified in subsections (1) through (3) of § 11-101(d). The question is whether they depict the "lascivious exhibition of the genitals" of the children.

The General Assembly has not defined "lascivious exhibition of the genitals," although its inclusion of the adjective "lascivious" necessarily precludes an interpretation that would qualify nudity itself as "sexual conduct." *See* Slip op. at 33 ("Images that depict the genitalia of nude children are not per se lascivious exhibitions."). The statute thus instructs that an exhibition of the genitals can be "sexual conduct" only if the exhibition is "lascivious." So, what qualifies an exhibition as "lascivious"? Where a term is not defined by statute, we often begin with dictionaries to give words their ordinary meaning. *State v. Krikstan*, 483 Md. 43, 65 (2023).

The Majority quotes *Black's Law Dictionary*'s definition of lascivious: "tending to excite lust; lewd; indecent; obscene." Slip op. at 43 (quoting *Lascivious*, *Black's Law Dictionary* 1053 (11th ed. 2019)). Other definitions are similar. *See, e.g.*, *Lascivious*, *New Oxford American Dictionary* 984 (3d ed. 2010) (defining "lascivious" to mean "feeling or revealing an overt and often offensive sexual desire"). I therefore do not quibble with the Majority's understanding that "nudity is lascivious if it is depicted in a sexual, indecent, or lewd manner or otherwise tends to arouse sexual desire." Slip op. at 43. Notably, however,

7

we are still concerned with what is depicted in the image itself, not the perception of the defendant. Nothing in the statutory text suggests that mere nudity can be lascivious in the hands of a defendant who is sexually aroused by it but not lascivious in the hands of a defendant who is not. The plain language of the statute unambiguously requires that the lascivious character of an exhibition must exist within the image or video, not the mind of the defendant.

### THE "CONTENT-PLUS-CONTEXT" STANDARD

For several reasons, I join the Majority in rejecting the State's contention that we should adopt an interpretation of "lascivious exhibition" that considers, if not turns on, the subjective motivations of the person creating, distributing, or possessing the image or video at issue. First and foremost, that definition is inconsistent with the plain language of the statutes, which, as discussed, focuses on what is depicted, rather than anyone's subjective reaction to it or purpose in creating or distributing it. Both § 11-207(a)(1) and § 11-208(b)(2) criminalize conduct involving the creation or possession of images and videos depicting children in certain circumstances, including being engaged as subjects in "sexual conduct." No language in either provision invokes the subjective viewpoint of the defendant. And "sexual conduct," as defined in § 11-101(d)(4), encompasses the "*lascivious* exhibition of the genitals" (emphasis added), not any exhibition of the genitals

8

that a particular defendant or category of individuals (such as pedophiles) might find sexually arousing, even if that exhibition is not objectively lascivious.[8]

Second, the General Assembly knows how to craft statutes where criminal liability depends on the defendant's subjective motivations. Indeed, § 3-602(b), which criminalizes child sexual exploitation (as applied here), is such a statute, because exploitation requires the State to show that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit." *Degren v. State*, 352 Md. 400, 426 (1999) (quoting *Brackins v. State*, 84 Md. App. 157, 162 (1990)). Similarly, for example, the General Assembly has prohibited certain acts of voyeurism, which prohibit a person, "with prurient intent," from "conduct[ing] or procur[ing] another to conduct visual surveillance of" an individual "in a private place" without their consent. Crim. Law § 3-902(c)(1). Here, neither § 11-207(a)(1) nor § 11-208(b)(2), by themselves or through their incorporation of the definition of "sexual conduct" in § 11-101(d), references a defendant's subjective motivation.

That aspect of Maryland's child pornography laws stands in contrast to laws in several other jurisdictions whose legislatures have adopted definitions of "sexual conduct" or related phrases that encompass any exhibition or nudity of a minor for the purpose of

---

[8] Nor, in our focus on the language of § 11-101(d)(4) and its use of the word "lascivious," should we lose sight of what the phrase "lascivious exhibition of the genitals" defines: a type of "sexual conduct." The phrase encompasses the conduct displayed in the depiction, not how someone subjectively views it.

9

obtaining sexual arousal or gratification.[9] Maryland's General Assembly, rather than

joining those states in adopting a subjective, defendant-dependent standard, instead

---

[9] *See* Ariz. Rev. Stat. Ann. § 13-3551 (2024) (defining "[e]xploitive exhibition" as "the actual or simulated exhibition of the genitals or pubic or rectal areas of any person for the purpose of sexual stimulation of the viewer"); Cal. Penal Code § 311.3(b)(5) (West 2024) (defining "sexual conduct" as "[e]xhibition of the genitals or the pubic or rectal area of any person for the purpose of sexual stimulation of the viewer"); Colo. Rev. Stat. § 18-6-403(2)(e) (2024) (defining "[e]xplicit sexual conduct" to include various actions that are "for the purpose of real or simulated overt sexual gratification"); Del. Code Ann. tit. 11, § 1100(7)(i) (2024) (defining "[p]rohibited sexual act" as "[n]udity, if such nudity is to be depicted for the purpose of the sexual stimulation or the sexual gratification of any individual who may view such depiction"); Idaho Code Ann. § 18-1507(1)(d), (e) (West 2024) (defining "[e]xplicit sexual conduct" as including "the display of the human male or female genitals or pubic area" among other body parts "for the purpose of real or simulated overt sexual gratification or stimulation of one (1) or more of the persons involved"); Ind. Code § 35-42-4-4(a)(5)(C) (2024) (defining "[s]exual conduct" as "exhibition of the:  (i) uncovered genitals; or (ii) female breast . . . intended to satisfy or arouse the sexual desires of any person"); Iowa Code Ann. § 728.1(7)(g) (West 2024) (defining "prohibited sexual act" as "[n]udity of a minor for the purpose of arousing or satisfying the sexual desires of a person who may view a visual depiction of the nude minor"); Mont. Code Ann. § 45-5-625(5)(b)(ii) (2024) (defining "[s]exual conduct" as "depiction of a child in the nude . . . to arouse or gratify the person's own sexual response or desire or the sexual response or desire of any person"); Neb. Rev. Stat. § 28-1463.02(3), (5)(e) (2024) (defining "[s]exually explicit conduct" as including "the display of" certain body parts "for the purpose of real or simulated overt sexual gratification or sexual stimulation of one or more of the persons involved"); N.J. Stat. Ann. § 2C:24-4(b)(1) (West 2024) (defining "[p]rohibited sexual act" as including "[n]udity, if depicted for the purpose of sexual stimulation or gratification of any person who may view such depiction"); 18 Pa. Cons. Stat. § 6312(g) (2024) (defining "[p]rohibited sexual act" as including "nudity if such nudity is depicted for the purpose of sexual stimulation or gratification of any person who might view such depiction"); Utah Code Ann. § 76-5b-103(10)(f) (West 2024) (defining "[s]exually explicit conduct" as including "the visual depiction of nudity or partial nudity for the purpose of causing sexual arousal of any individual"); Wash. Rev. Code § 9.68A.011(4)(f) (2024) (defining "[s]exually explicit conduct" as including the "[d]epiction of" certain body parts "for the purpose of sexual stimulation of the viewer . . . [and] it is not necessary that the minor know that he or she is participating in the described conduct, or any aspect of it").

adopted an objective standard focused on the content of the depiction.[10]

Third, although we need not look beyond the unambiguous, plain language of the statutory provisions at issue, *Westminster Mgmt.*, 486 Md. at 645 & n.17, the legislative history supports my interpretation of "lascivious exhibition" as focusing on the objective characteristics of the image. The General Assembly added the "lascivious exhibition" meaning of "sexual conduct" to § 11-101(d) in 2019. 2019 Md. Laws, chs. 325 & 326.[11] The General Assembly did so "to update the standard for 'sexual conduct' so that it was consistent with the federal standard[.]" *In re S.K.*, 466 Md. 31, 56 n.22 (2019). Then-Senator Susan C. Lee advocated the change because Maryland's "standards [were] out of

---

[10] Although the General Assembly's decision not to enact legislation that it considered is often of limited value in interpreting the meaning of legislation it did enact, *Westminster Management*, 486 Md. at 651, we note that before the General Assembly added "lascivious exhibition of the genitals" to the definition of "sexual conduct" in 2019, it rejected attempts to add subjective language to the relevant statutory scheme. In 1978, in adopting the statute that would eventually become § 11-207, the General Assembly considered a number of alternative bills, some of which would have applied a subjective standard to one or more elements of the law. *See, e.g.*, H.B. 262, 1978 Gen. Assemb., Reg. Sess. (Md. 1978) (defining "Prohibited Sexual Conduct" as "nudity when such nudity is to be depicted for the purpose of sexual stimulation or gratification of any person who may view the nude depiction"); H.B. 868, 1978 Gen. Assemb., Reg. Sess. (Md. 1978) (bill would have added a defendant's subjective intent ("for the purpose of sexual stimulation") into the "sadomasochistic abuse" definition of sexually explicit conduct, but not into the "lewd exhibition" definition). Also, in 2007, 2008, and 2009, the General Assembly considered but did not adopt bills that would have expanded the definition of "sexual conduct" in Subtitle 2 of the Criminal Law Article to include "the display of the genitals of an individual for purposes of sexual arousal or gratification." *See, e.g.*, S.B. 1003, 2007 Gen. Assemb., Reg. Sess. (Md. 2007); S.B. 75/H.B. 574 & H.B. 436, 2008 Gen. Assemb., Reg. Sess. (Md. 2008); S.B. 99, 2009 Gen. Assemb., Reg. Sess. (Md. 2009).

[11] The change was added through the adoption of the cross-filed House Bill 1027 and Senate Bill 736, both of which were signed by Governor Lawrence J. Hogan, Jr. and became, respectively, Chapters 325 and 326 of the 2019 Laws of Maryland.

11

date with other states and the federal government, specifically with the inclusion *of images that are considered lewd or lascivious*." Bill File for S.B. 736, Sen. Susan C. Lee Letter to Jud. Proc. Committee, SB 736-Criminal Law-Child Pornography (Feb. 22, 2019) (emphasis added). Senator Lee lamented that under existing law, "a child appearing alone in a photo must touch their own body in some way in order to meet the definition of sexual conduct." *Id.* The addition of the "lascivious exhibition" language would "remove[] that touching requirement." *Id.*

Other materials in the Bill Files reflect an understanding that the addition would encompass only images that are objectively sexual. The Maryland Coalition Against Sexual Assault testified that the change would allow the prosecution of "child pornographers who produce or possess *images that are undeniably sexually explicit*, but do not show active touching." Bill File for H.B. 1027, 2019 Gen. Assemb., Reg. Sess. (Md. 2019), Maryland Coalition Against Sexual Assault, Testimony Supporting H.B. 1027 with Amendment (Mar. 6, 2019) (emphasis added). The Coalition said that the amended statute would therefore reach images or videos of "naked toddlers and infants, propped up, bent over in sexual poses in beds or spread eagle on the floor," and an actual case "where an adult male put his erect penis next to the baby and created pornographic images[.]" Bill File for S.B. 736, 2019 Gen. Assemb., Reg. Sess. (Md. 2019), Maryland Coalition Against Sexual Assault, Testimony Supporting S.B. 736 with Amendment, at 1-2 (Mar. 27, 2019). And a statement in support of the Bill from Delegate Lesley J. Lopez stated that "[l]ascivious exhibition essentially involves a sexual act or exhibition that does not involve

12

actual physical or sexual contact with the victim." Bill File for H.B. 1027, 2019 Gen. Assemb., Reg. Sess. (Md. 2019), Del. Lesley J. Lopez Letter to the Maryland House of Delegates, Support: HB 1027-Criminal Law-Child Pornography. The parties have not pointed us to anything in the legislative history, nor have I found anything, that reflects a legislative intention that the lasciviousness of an exhibition should be gauged from the perspective or intent of an individual defendant, as opposed to an objective view of the image.[12]

For all those reasons, I agree with the Majority that an image or video depicts "lascivious exhibition of the genitals or pubic area of a person" only if it is objectively sexual in nature, a standard that is not dependent on the subjective viewpoint of the defendant or another individual or category of individuals. *See* Slip op. at 47. I also agree with the Majority that the inquiry should account for context, but only to the extent that it bears directly on "whether an image is objectively sexual in nature." *Id.* at 31. For example, it is not always possible to determine only from an image or video itself the entire

---

[12] In its own analysis, the Majority draws the conclusion that the legislative history from 2019 "demonstrates that the purpose of the amendment was to expand the categories of conduct that could be punished under Maryland's child pornography statutes." Slip op. at 45-46. I agree. The General Assembly accomplished that by extending the law to a category of sexual images that do not involve touching, which, as reflected in statements in the Bill File, was a goal of those who supported the change. That the General Assembly intended to expand the reach of the statute justifies interpreting it to have done so, but not more broadly than reflected in the change the General Assembly made. Regardless of whether we think the current General Assembly may support an even broader criminalization of conduct in this area, it is not our role to expand existing law to reach conduct that the General Assembly has not, to date, made criminal.

nature of what is depicted within it. A close-up image might appear to depict an entirely different scene than it would if it were zoomed out further or if it also included what was on the other side of the camera. Context indicating whether a close-up image of a child's genitals was taken, for example, on a physician's examination table with parents present, or on a floor surrounded by objects suggestive of sexual or sadomasochistic activity may help inform a jury concerning whether the image itself, including any expression appearing on the face of the subject, is objectively sexual.

Similarly, things that are within the frame of an image or video might strike a viewer differently with context. For example, context may help identify an object in an image or video that is either unclear or that appears to be something different than it is. Context may also help explain why an object in an image or video was present at the time the image or video was made when a juror might otherwise be inclined to incorrectly conclude that it was present for innocent or, alternatively, nefarious reasons.

In all these examples, context can help a jury understand what the image or video actually depicts, unrelated to whether the defendant—the creator, distributor, or possessor—themself might derive sexual pleasure from it or think that others may do so. As the Majority explains, such context is also important to ensure that the statute is not applied in an over-inclusive or under-inclusive manner, either by criminalizing the creation or possession of images or videos that, understood in context, are not sexual in nature, or by allowing defendants to evade responsibility for images or videos that, understood in context, are. *Id.* at 47-48. But, as the Majority also explains—and critical to the proper

14

application of the standard—"contextual evidence must be directly related to the exhibition. That is, it must tend to shed light on the meaning of the exhibition – i.e., whether the exhibition is sexual in nature – when viewed objectively." *Id.* at 51. Consequently, "the State must do more than simply show that its creator subjectively found [the image] to be sexual in nature. The State must show that the image is objectively sexual in nature." *Id.* Adhering to those core principles, I agree with the Majority that the "content-plus-context" standard is appropriate where context "directly relate[s] to the exhibition of a child's genitals or pubic area." *Id.* at 31.

Although I agree in significant part with the Majority's articulation of the "content-plus-context," I differ in a few respects. The Majority describes the "context" portion of its test as "the totality of the circumstances that directly relate to the exhibition of the genitals or pubic area." Slip op. at 47. I would describe the "context" portion of the test as "*limited to those* circumstances that directly relate to the exhibition of the genitals or pubic area in the image." Given that both phrasings limit the inquiry to circumstances directly related to the exhibition, the difference between these two statements may be only semantic—the Majority's emphasis on breadth by using the phrase "totality of the circumstances" versus my emphasis on the limited nature of the inquiry. Given our different application of the standard, however, it is possible that it is a difference of significance. Context is relevant only to the extent it sheds light on the objective nature of the image or video itself. *Id.* at 51-52. Evidence that goes too far beyond that risks turning

15

the inquiry from what is depicted in the image, which is the focus of the statutory provisions at issue, to what was in the mind of the photographer or videographer.

Perhaps relatedly, in distinguishing its "content-plus-context" standard from that applied by the United States Court of Appeals for the Sixth Circuit in *United States v. Brown*, 579 F.3d 672 (6th Cir. 2009), the Majority makes statements that open the door for consideration of context reflecting only on the subjective motivations of the viewer or creator of images. For example, the Majority disavows the Sixth Circuit's "suggest[ion] that a defendant's creation or possession of pornographic images of other children may not be considered in determining whether a particular image of a child is a lascivious exhibition" because, the Majority states, comparing such images "could help inform the factfinder's determination of whether, viewed objectively, the purpose of one or more of the images was to excite lust or to arouse sexual desire in the viewer." Slip op. at 52 n.24. But although such comparisons may reflect on the viewer or creator's subjective purpose with respect to all of the images, they do not add context that "shed[s] light on the meaning of the exhibition – i.e., whether the exhibition is sexual in nature – when viewed objectively." *See id.* at 51.

**APPLICATION OF THE "CONTENT-PLUS-CONTEXT" STANDARD**

I disagree with the Majority's application of the "content-plus-context" standard here. I would conclude that none of the eight photographs at issue depicts a "lascivious exhibition of the genitals." As the Majority correctly identifies, the question before us is

16

whether a reasonable jury could determine that the images themselves were "objectively sexual in nature." I conclude that the answer is no.

With respect to content, the Majority opinion describes each of the photographs in detail. *Id.* at 9-11. Seven of the photographs depict a child on a diaper-changing table, naked, in a position that is fully consistent with a child having her diaper changed. The final picture depicts a child in a standing position in a bathroom, naked from sternum to the knees. None of the children are posed in anything resembling a sexual position. There are no other people in any of the photographs, nor are there any objects that are sexual in nature or that change the nature of the images from children getting diaper changes to anything objectively sexual.

In its own analysis of the content of the photographs, the Majority focuses on two primary considerations. First, the images are framed so that they include the children's genitals at or near the center of the photographs, and do not include their faces. *Id.* at 53. Although I agree that the framing of the photographs is a relevant consideration, the framing here still makes clear that the pictures are of children during the process of a diaper change. Second, the Majority contends that "a rational juror could conclude that Ms. Turenne put several of the children in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals." *Id.* at 54. On that point, I disagree. The children are situated in the midst of diaper changes— a perfectly ordinary, nonsexual event—not posed in sexual positions. That an image of an adult posed in a similar manner might be viewed as an objectively sexual image—perhaps

17

viewed as sexual *because* the position is unnatural for an adult in the ordinary course of a day, or perhaps just because of anatomical development—is irrelevant, because these are images of infants, not adults.

Turning to context, the Majority identifies four elements that it believes could contribute to a rational juror's conclusion that the photographs are objectively sexual: (1) the photographs are all very similar to each other; (2) they were all taken at a daycare center; (3) they were all taken in the center's bathroom, where Ms. Turenne was secluded; and (4) Ms. Turenne stated that the photographs "had no meaning" but also provided an implausible documentation-of-diaper rash explanation. *Id.* at 55-56. I agree that all four of those contextual elements are relevant to the jury's consideration of Ms. Turenne's likely purpose in taking and keeping the images. They were, therefore, proper considerations for the jury in determining whether Ms. Turenne exploited the children for her own benefit in connection with the child sexual abuse charges.

However, the only contextual element that is relevant to the jury's understanding of what is depicted in the images themselves, to the extent it is unclear in any of them, is that the children in seven of the eight images were lying on a changing table and the eighth was in a bathroom. But knowledge of the setting in which the pictures were taken does not add any element of objective sexuality to them, separate and apart from Ms. Turenne's subjective motivation. The other contextual elements identified by the Majority speak to

18

Ms. Turenne's subjective motivation, not what is depicted in the images themselves.[13] That the photographs are similar to each other does not add a sexual element to all of them that does not otherwise exist in any individual photograph.[14] A jury may infer from the similarity that Ms. Turenne was attracted to the images, but that does not make them objectively sexual. Similarly, that the photographs were all taken while no other adults were present, and Ms. Turenne's inability to provide a plausible explanation for her conduct, certainly may reflect on her own subjective motivations, but that context does not add any element of objective sexuality to the photographs. There is, for example, no contextual element suggesting that the children were not actually engaged in having their diapers changed, that they were engaged in any other activity in addition to that, or that objects unrelated to the diaper change were present. Put simply, there are no contextual elements that add any information reflecting on the objective sexuality of the images.

The State charged Ms. Turenne with violating three statutes with respect to each of the eight photographs she took and kept. The General Assembly's purpose in enacting

---

[13] I agree with the Majority that there are contextual elements that can be relevant to both a defendant's subjective motivation in creating, distributing, or possessing certain images or videos *and* to consideration of whether the image or video is objectively sexual. Slip op. at 51. Here, however, the contextual evidence cited by the State "only shows the defendant's subjective reaction to an exhibition and does not directly relate to the exhibition itself[.]" *See id.* at 52. Accordingly, it "is not probative of whether the exhibition is objectively sexual in nature." *See id.*

[14] The Majority's reliance on the similarity of the photographs to each other seems to conflict with its statement in a different part of the opinion that "[a]n image is either lascivious or not lascivious at the moment it is created." Slip op. at 51. I agree with that statement.

each of those three statutes was to protect children. But none of the three statutes provides a general license for the State to criminally prosecute any and all conduct it determines to have been harmful or offensive, or for a court to uphold any and all convictions for conduct it determines to have been harmful or offensive. Instead, each statute contains specific elements that the State must prove to obtain a conviction. We honor the General Assembly's intent in enacting the statutes by applying their terms, not by applying them more expansively to cover conduct we think the General Assembly would also find offensive.

Here, the State's evidence satisfied the elements of one of the statutes (§ 3-602(b) of the Criminal Law Article), but not of the other two (§§ 11-207(a)(1) and 11-208(b)(2)). Regardless of how we feel about Ms. Turenne's conduct, we are limited by the terms of the statutes the General Assembly has enacted. Subsections 11-207(a)(1) and 11-208(b)(2) criminalize, respectively, the creation or possession of images only if they depict a "lascivious exhibition of the genitals." Because the images taken by Ms. Turenne do not meet that standard, the convictions for violating those provisions should be reversed.

For these reasons, I would affirm Ms. Turenne's convictions for violation of § 3-602(b) of the Criminal Law Article and reverse her convictions for violation of §§ 11-207(a)(1) and 11-208(b)(2) of the Criminal Law Article. I therefore respectfully concur in part and dissent in part.

Justice Booth advises that she joins this concurring and dissenting opinion.

20

Circuit Court for Wicomico County
Case No. C-22-CR-21-000263

Argued: April 5, 2024

IN THE SUPREME COURT

OF MARYLAND

No. 20

September Term, 2023
_____

ROSEBERLINE TURENNE

v.

STATE OF MARYLAND
_____

Fader, C.J.
Watts
*Hotten
Booth
Biran
Gould
Eaves,

JJ.
_____

Dissenting Opinion by Watts, J.
_____

Filed: August 16, 2024

*Hotten, J., now a Senior Justice, participated in the hearing and conference of this case while an active member of this Court. After being recalled pursuant to Maryland Constitution, Article IV, § 3A, she also participated in the decision and adoption of this opinion.

Respectfully, I dissent. I agree with Chief Justice Fader that there is insufficient evidence to support the convictions of Roseberline Turenne, Petitioner, for production and possession of child pornography. See Concurring and Dissenting Slip Op. at 16-17, 20 (Fader, C.J., concurring and dissenting). I write separately because I would also conclude that the evidence was insufficient to support Ms. Turenne's convictions for child sexual abuse.[1] The Majority affirms Ms. Turenne's convictions for child sexual abuse while expressly declining to consider as part of its sufficiency analysis evidence elicited by the State that Ms. Turenne is gay, bisexual, or otherwise sexually attracted to women and that her phone contained adult pornography. See Maj. Slip Op. at 29 & n.16. From my perspective, when viewed in the light most favorable to the State, with these circumstances omitted, the remaining evidence is insufficient to support Ms. Turenne's convictions for child sexual abuse.

The elements of child sexual abuse are well-established. Md. Code Ann., Crim. Law (2002, 2021 Repl. Vol.) § 3-602(a)(4)(i) defines "sexual abuse" as "an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not." This case involves sexual exploitation, which "requires that the defendant took advantage of or unjustly or improperly used the child for his or her own benefit." State v. Krikstan, 483 Md. 43, 52, 290 A.3d 974, 979 (2023) (cleaned up). That benefit can be in the form of sexual gratification. See id. at 76, 290 A.3d at 994. In this

---

[1]Accordingly, I cannot join the concurrence and dissent in its entirety, which would affirm Ms. Turenne's convictions for child sexual abuse and reverse her convictions for production and possession of child pornography. See Concurring and Dissenting Slip Op. at 20 (Fader, C.J., concurring and dissenting).

case, the Majority concludes that the evidence was sufficient for the jury to find that Ms. Turenne took the photos at issue for the purpose of sexual gratification.[2] See Maj. Slip Op. at 2.

I would conclude that, if the evidence regarding Ms. Turenne's sexual orientation as well as the adult pornography on her phone are excluded from consideration (as they are in the majority opinion), taken in the light most favorable to the State, the evidence is not sufficient to establish beyond a reasonable doubt that Ms. Turenne took the photos for sexual gratification.[3] The photos portray young children in a daycare center, either lying on changing tables or, in one instance, standing on the bathroom floor, with their pubic or genital areas visible. See Maj. Slip Op. at 9-10. Some of the photos show redness or darkened areas—*i.e.*, consistent with diaper rashes—near the genital area and/or the in the fold of the buttocks, and one of them shows diaper cream in and around the fold of the buttocks. See Maj. Slip Op. at 9-10. Ms. Turenne testified that she took the photos to

---

[2]Although we have explained that CL § 3-602 is to be interpreted broadly and, in recent case law, we have expanded its application, in this case, the State pursued Ms. Turenne's convictions solely on the theory that sexual gratification was the benefit she received. The State does not contend, for instance, that Ms. Turenne benefited by taking photos of the children for her own protection against claims of providing less than adequate child care. The sole issue with respect to whether the evidence is sufficient to support Ms. Turenne's child sex abuse convictions is whether Ms. Turenne took the 8 photos for the purpose of sexual gratification.

[3]At times during the history of this case, the terms "sexual preference" and "sexual preferences" and the terms "preference" and "preferences" were used to refer to Ms. Turenne's sexual orientation. "The term *sexual preference* as used to refer to sexual orientation is widely considered offensive in its implied suggestion that a person can choose who[m] they are sexually or romantically attracted to." *Sexual Preference*, Merriam-Webster, https://www.merriam-webster.com/dictionary/sexual%20preference [https://perma.cc/W43F-GHDR] (italics in original).

prove that children had diaper rashes before she started watching them. Although the jury evidently did not find this part of Ms. Turenne's testimony credible, the nature of the photos and the circumstances surrounding them being taken do not alone establish that the photos were taken for the purpose of sexual gratification.

In concluding otherwise, the Majority relies on the circumstances: (1) that the photos allegedly focused on the children's "genitals"; (2) "that Ms. Turenne purposely put several of the children in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals"; (3) that the photos omitted faces; (4) that Ms. Turenne violated the daycare center's prohibition on taking photos and took most of the photos after teachers began leaving or in the bathroom; and (5) that Ms. Turenne initially lied to investigators about having taken the photos. Maj. Slip Op. at 24-25. I do not agree that based on these circumstances there was sufficient evidence for the jury to infer that Ms. Turenne took the 8 photos for sexual gratification.

I disagree with the first and second factors as described by the Majority. And, I disagree that factors three, four, and five would result in a rational juror finding beyond a reasonable doubt that Ms. Turenne took the photos for sexual gratification. The Majority describes the photos in the most graphic way possible. The Majority, similar to the Appellate Court (which referred to "unclothed vaginas"), describes the photos as showing "the children's naked genitals and pubic areas." Turenne v. State, 258 Md. App. 224, 231, 297 A.3d 340, 344 (2023); Maj. Slip Op. at 1. The Majority also states the children are "in poses that resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals." Maj. Slip Op. at 24. The photos do not, however,

- 3 -

show any child's "vagina." Nor do they show any child in a pose that would "resemble what one might see in some adult pornography: the subject on her back, her legs spread, displaying her genitals." Maj. Slip Op. at 24. The photos show only the pubic or external genital area of the children, and, in all of the photos except one, the children are lying on changing tables, with their legs in the position that one would hold a child to change a diaper.[4] As the concurrence and dissent points out, "[t]he children are situated in the midst of diaper changes—a perfectly ordinary, nonsexual event—not posed in sexual positions." Concurring and Dissenting Slip Op. at 17 (Fader, C.J., concurring and dissenting). This candid description of the photos (with which I agree) debunks the Majority's conclusion that the "photos focused on the children's genitals" and that "Ms. Turenne purposely put several of the children in poses that resemble what one might see in some adult pornography[,]" and thereby "could have caused a reasonable juror to infer that Ms. Turenne took those photos for her own sexual gratification." Maj. Slip Op. at 24.

Viewed in the light most favorable to the State, all but one of the photos depict children lying on changing tables, as if in the midst of diaper changes. Although the photos were taken clandestinely in violation of the daycare center's no-photo policy and Ms. Turenne initially denied having taken them, these facts were not sufficient for a rational juror to infer that the photos were taken for sexual gratification.[5] Absent evidence of Ms.

---

[4]Anyone who has ever changed a diaper would be familiar with the position.

[5]On the other side of the ledger, a forensic extraction of Ms. Turenne's cellphone's data, including an analysis of all 145,047 pictures on her camera roll, revealed just the 8 photographs of children's genitals and pubic area. As explained, 7 of these took place in or around a diaper changing area. Most of the photos feature diaper cream or rashes, and

- 4 -

Turenne's sexual orientation and possession of adult pornography, based on the position of the children in 7 of the 8 photos and the redness or darkened spots on their exterior genital areas, a rational juror could have inferred that Ms. Turenne took the photos because she was concerned about being blamed for diaper rashes and lied about having taken them because she knew doing so was against the daycare center's policy. A rational juror also could have inferred that Ms. Turenne took the photos while she was alone with the children because she knew that taking the photos was against the center's policy. Despite the emphasis the Majority places on this factor, the circumstance that Ms. Turenne took the photos after teachers left for the day or in the bathroom, *i.e.*, while she was alone with the children, is of no real consequence in the sufficiency of the evidence analysis.[6] See Maj. Slip Op. at 25.

---

many of the rashes appear quite severe. No videos of children were shot. Ms. Turenne made no effort to hide or destroy the photographs. She physically handed her phone, loaded with the unencrypted material, to a colleague who effortlessly swiped through her camera roll. The forensic analysis did not reveal Ms. Turenne searched for child pornography on the internet. There is no evidence that Ms. Turenne communicated with pedophiles or any law enforcement personnel posing as one. When confronted with the inconsistencies between her police interview and trial testimony, Ms. Turenne explained that the inconsistencies came from initial confusion about the investigation's purpose, her immigration status, and lack of experience with the police.

[6]Regardless of whether the photos were taken to protect against allegations of causing diaper rash or for the purpose of sexual gratification, as the State contends, logic dictates that the photos would not have been taken in the presence of others. Similarly, that the photos omit the faces of the children is not a factor that supports the conclusion that they were taken for sexual gratification. Given that diaper rashes necessarily occur around the genitals and in the pubic area, it would obviously make sense for Ms. Turenne's photographs to have focused on those areas and not anywhere else, if she were attempting to document diaper rash. To rebut this obvious point, the Majority posits that Ms. Turenne would have had difficulty identifying the children who developed rashes because no faces were captured. See Maj. Slip Op. at 24-25, 26 n.14. However, if a parent wanted to

- 5 -

Without consideration of evidence admitted at trial concerning Ms. Turenne's sexual orientation and possession of adult pornography,[7] no rational juror could have found beyond a reasonable doubt based on the appearance of the photos that they were taken for sexual gratification. The burden was on the State to prove such a purpose beyond a reasonable doubt, and, without consideration of Ms. Turenne's sexual orientation and

---

complain about a child developing diaper rash at the facility, the parent would likely have done so as soon as possible. It is entirely reasonable that Ms. Turenne would have been able to identify the child because she was the person who would have recently changed the child's diaper. Ms. Turenne being unable to identify the children almost a full year later at trial is understandable given the length of time between her taking the photos and testifying. Neither the circumstance that the photos were taken while Ms. Turenne was alone with the children nor that they omit faces would result in a rational juror concluding beyond a reasonable doubt that the photos were taken for the purpose of sexual gratification. That the photos were still on Ms. Turenne's phone over a year later adds nothing to the sufficiency of the evidence analysis. A rational juror could have concluded from the fact that Ms. Turenne casually handed her phone to a colleague who readily observed the photos, that as she told the investigators, she simply forgot that the photos were there.

[7]Such consideration would be improper because there is no connection between sexual orientation and sexual attraction to children, or between adult pornography and child pornography. By way of illustration, in People v. Stowe, 231 N.E.3d 688, 689 (Ill. App. Ct. 2022), appeal denied, 221 N.E.3d 321 (Ill. 2023), the defendant was charged with sexual abuse of a 14-year-old boy, and the Appellate Court of Illinois, Second District, held that the trial court erred in admitting into evidence photos of nude adult men retrieved from the defendant's cell phone and that the trial court's error prejudiced the defendant. The Court noted that its conclusion was reinforced by multiple cases from other jurisdictions. See id. at 700. For instance, the Court quoted State v. Crotts, 820 N.E.2d 302, 306 (Ohio 2004), in which the Supreme Court of Ohio observed: "[T]he modern understanding of pedophilia is that it exists wholly independently from [being gay]. The existence or absence of one neither establishes nor disproves the other. The belief that [gay people] are attracted to [] children is a baseless stereotype." Stowe, 231 N.E.3d at 700 (internal quotation marks omitted). The Appellate Court of Illinois, Second District, concluded that the trial court's error was not harmless and explained that the trial court's "failure to give a limiting instruction [] permitted the jury to consider the evidence for any reason, including to draw an impermissible propensity inference based on sexual orientation . . . , thus enhancing the prejudice to defendant." Id. at 703 (citation omitted).

possession of adult pornography, the evidence was insufficient to amount to such proof.[8]

I am aware that, as the Majority notes, we did not grant the petition for a writ of *certiorari* as to the question of whether the circuit "court plainly err[ed] by allowing the prosecutor to impermissibly appeal to the prejudices of the jury by invoking homophobic tropes based on testimony, elicited by the prosecutor, that [Ms. Turenne] was gay or bisexual[.]" See Maj. Slip Op. at 18 n.11. I also realize that, as the Majority and the concurrence and dissent observe, Ms. Turenne's counsel not only failed to object to the State's references to her sexual orientation when questioning witnesses and arguing before the jury, but also seemed to buy into the notion that her sexual orientation was relevant. See Maj. Slip Op. at 12-14, 29 n.16; Concurring and Dissenting Slip Op. at 2 n.4 (Fader, C.J., concurring and dissenting). And, during Ms. Turenne's closing argument, her counsel pointed out to the jury that Ms. Turenne identified as bisexual and that her phone also contained photos of adult male genitalia. Regardless of how those observations were intended, they could be interpreted as an attempt by Ms. Turenne's counsel to argue that

---

[8]Although the Majority states that it need not consider the evidence regarding Ms. Turenne's sexual orientation as part of its sufficiency analysis, the Majority echoes the State's position at trial by pointing out that "[n]o images of nude boys were found on Ms. Turenne's phone[,]" and that, at trial, the State asked Ms. Turenne if she told Ms. Miller she was attracted to women and that, in closing argument, the prosecutor argued "that none of the pictures Ms. Turenne took were of boys[.]" See Maj. Slip Op. at 11-13. This part of the majority opinion undercuts the Majority's statement that it "need not decide whether the evidence that was introduced concerning Ms. Turenne's sexual orientation supports her convictions in this case." Maj. Slip at. 29 n.16. The fact is that the State leaned heavily on evidence regarding Ms. Turenne's sexual orientation at trial. Excluding evidence of Ms. Turenne's sexual orientation from consideration in its sufficiency analysis could be seen as a tacit acknowledgment by the Majority that the admission of such evidence was an abuse of discretion and was prejudicial to Ms. Turenne. Otherwise, there would have been no reason for the Majority not to have considered the evidence.

she is less likely to be sexually attracted to children who are girls because she is bisexual rather than gay.

Although the issues of plain error and the propriety of trial counsel's conduct are not before us, I believe it would violate the principle of fundamental fairness to find the evidence sufficient to support Ms. Turenne's convictions for child sexual abuse where the record makes clear that one of the primary bases for the convictions was the evidence that she is gay, bisexual, or otherwise sexually attracted to women. As a witness for the State, Nadasia Miller, an aide at the daycare center, testified that Ms. Turenne said that she is gay. During Ms. Turenne's cross-examination, the prosecutor asked whether she is attracted to women, and she responded: "I wouldn't say attracted to women, like, I will say, like, I'm not only, I will say, like, I'm bisexual, like, I'm still confused about what I like between men or women. But not children, no." During the State's initial closing argument, the prosecutor pointed out that all of the photos at issue were of child female genitalia, commented that it was "interesting that apparently no boys had rashes at the time[,]" and stated of Ms. Turenne: "She told one of her friends that she was gay or bisexual, which[] obviously doesn't matter, but it matters when you're looking at whether she had any sexual gratification for taking these pictures[.]" And, during the State's rebuttal closing argument, the prosecutor stated of Ms. Turenne: "There's no inference made by the fact that she would be gay or bisexual. That's irrelevant. The only reason we're considering that is the inference that she has sexual gratification and that that connects to the pictures themselves." In short, evidence regarding Ms. Turenne's sexual orientation, *i.e.*, that she may be gay, bisexual, or otherwise sexually attracted to women,

along with the fact that all of the pictures showed female genitalia, was repeatedly emphasized during the trial, and this evidence undoubtedly influenced the jury's decision to find her guilty of child sexual abuse.

Clearly, the evidence admitted at trial concerning Ms. Turenne's sexual orientation would have been perceived by the jury as probative of whether Ms. Turenne took the photos for sexual gratification, and Ms. Turenne was prejudiced by the admission of the evidence.[9] Contrary to the Majority's assessment, it is not possible to simply excise from consideration evidence concerning Ms. Turenne's sexual orientation and possession of adult pornography and conclude that other evidence was sufficient to support her conviction of child abuse. See Maj. Slip Op. at 28-30 & n.16. The Majority, in essence, engages in a harmless error type of analysis, under which "an appellate court does not

_____

[9]The Majority's explanation "that the prosecutor was not arguing that Ms. Turenne was probably a child abuser because she was gay[,]" however, "both counsel seemed to be of the view that Ms. Turenne's sexual orientation could shed light on whether the photos of the children were sexual in nature and whether Ms. Turenne took them for sexual gratification" is troubling. Maj. Slip at 29 n.16 (cleaned up). The Majority states that "[w]ithout data to support a correlation of this sort, litigants should avoid eliciting such evidence and making such arguments, regardless of the defendant's particular sexual orientation and regardless of the genders of the defendant and victim." Maj. Slip Op. at 29 n.16. Even though the Majority references the Appellate Court's view that where a defendant "is of the same gender as the alleged victim, an attempt to make such a connection is particularly concerning, because it 'could be misinterpreted' as 'reinforc[ing] a terrible stereotype of gay and lesbian people' and 'perpetrating a pernicious falsehood about same-sex orientation[,]'" Maj. Slip Op. at 29 n.16 (quoting Turenne, 258 Md. App. at 264, 297 A.3d at 363) (alteration in original), this appears to be the Majority's way of saying that, although evidence regarding Ms. Turenne's sexual orientation will not be considered in the sufficiency analysis, it may nonetheless have been appropriate, with the provision of data, for the jury to have had evidence regarding Ms. Turenne's sexual orientation in considering whether she took photos of infant girls for sexual gratification. I disagree with the Majority on this point.

reverse a conviction based on a trial court's error or abuse of discretion where the appellate court is satisfied beyond a reasonable doubt that the trial court's error or abuse of discretion did not influence the verdict to the defendant's detriment." Gonzalez v. State, 487 Md. 136, 184, 316 A.3d 484, 512 (2024) (cleaned up). Had there been an objection to the admission of evidence concerning Ms. Turenne's sexual orientation and possession of adult pornography and had the objection been overruled, I do not believe that either the Appellate Court or this Court would have found that the admission of such evidence was harmless beyond a reasonable doubt.

It is equally important not to lose sight of the circumstance that the circuit court imposed an aggregate sentence of 280 years of imprisonment, with all but 126 years suspended, followed by 5 years of probation and lifetime registration as a sex offender. Because 8 photos were at issue, Ms. Turenne was convicted of 8 counts each of child sexual abuse (Counts 1-8) and production of child pornography (Counts 9-16).[10] The circuit court imposed: 25-year sentences, with no time suspended, for Counts 1 and 7; 25-year sentences, with all but 10 years suspended, for Counts 2 through 6 and Count 8; and 10-year sentences, with all but 2 years suspended, for Counts 9 through 16. The circuit court made each sentence, other than the one for Count 1, consecutive to all of the previous sentences.

Although criminal offenses against children are heinous and must be dealt with

_____

[10]Although Ms. Turenne was also convicted of 8 counts of possession of child pornography (Counts 17-24), for sentencing purposes, the circuit court merged the possession convictions with the production convictions.

appropriately, and although the General Assembly has authorized serious penalties for the offenses of child sexual abuse and production and possession of child pornography, it is disproportionate and draconian to impose an aggregate sentence of nearly 3 centuries of imprisonment, with all but 126 years suspended, under the circumstances of this case.[11] To be sure, the sufficiency of the evidence analysis is not driven by the sentence imposed in a case. In this case, though, taking the evidence in the light most favorable to the State, without consideration of evidence concerning her sexual orientation and possession of adult pornography, it is not possible to conclude that there was sufficient evidence to support Ms. Turenne's convictions for child sexual abuse. I would reverse Ms. Turenne's convictions for both production and possession of child pornography and child sexual abuse.

For the above reasons, respectfully, I dissent.

---

[11]As far as the record reveals, Ms. Turenne's counsel did not request a modification or reconsideration of her sentences or a review of them by a three-judge panel. The absence of such requests, as well as Ms. Turenne's counsel's actions and omissions in connection with the evidence regarding her sexual orientation and possession of adult pornography, give rise to serious concerns about the effectiveness of counsel. A postconviction proceeding would be the appropriate venue for addressing these concerns.